(Decided 16th December, 1887.)

---

WALTER B. BROOKS *vs.* ADOLPH AHRENS, Surviving partner of STIRLING & AHRENS.

*Assignee in Bankruptcy—Act of Congress re-establishing the Court of Commissioners of Alabama claims—Res judicata—War premiums—Reimbursement—Doctrine of Relation.*

From 1852 to the 31st of December, 1867, the appellee was a member of the firm of Stirling & Ahrens, shippers and general commission merchants, their shipping trade being carried on between the port

Brooks *vs.* Ahrens.

of Baltimore, and the ports of the West Indies and of South America. The firm, between the dates of the 13th of April, 1861, and the 9th of April, 1865, paid large sums as extra or enhanced premiums, known as " war premiums," against loss or capture of vessels and cargoes by Confederate cruisers. Subsequently to the payment of these premiums, changes took place in the membership of the firm, the appellee, however, remaining a member. In August, 1875, the firm, then existing under the name of Stirling, Ahrens & Company, committed an act of bankruptcy, and in December of the same year it was adjudged bankrupt, and the appellant was appointed assignee in bankruptcy of the bankrupt firm, and of each member thereof individually, and duly assumed the trust. The Act of Congress of the 5th of June, of 1882, for re-establishing the Court of Commissioners of Alabama claims, provided for the payment of premiums for war risks, paid after the sailing of any Confederate cruiser. Under this Act, and by the judgment of the Court of Commissioners re-established thereby, the appellant, as assignee in bankruptcy, was awarded a large sum of money for the " war premiums " paid by the original firm of Stirling & Ahrens. In an action by the appellee, surviving partner of the original firm of Stirling & Ahrens, to recover this sum from the appellant, the assignee in bankruptcy, it was HELD :

1st. That the judgment of the Court of Commissioners of Alabama claims had no effect as *res judicata.*

2nd. That no right existed in the bankrupts at the date of their bankruptcy declared, to receive reimbursement for the " war premiums" paid, and consequently no right could pass to their assignee.

3rd. That as the claims for allowance of such extra, or " war premiums," against Great Britain were rejected by the Geneva tribunal, the provision made by the Act of Congress of the 5th of June, 1882, for the payment of such premiums, was an act of gratuity, and being so, the doctrine or principle of relation could not be invoked to give this right created by the Act of 1882, relation back to the time of bankruptcy, and the assigment to the appellant.

4th. That the appellee, as surviving partner of Stirling & Ahrens, was entitled to recover from the appellant the money received by him for " war premiums."

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, MILLER, IRVING, and BRYAN, J.

*Randolph Barton,* and *Skipwith Wilmer,* for the appellant.

*James H. Gable, Thomas W. Hall,* and *S. Teackle Wallis,* for the appellee.

Neither the payment of the war premiums originally, nor the reimbursement for their outlay, in part, by the Act of Congress of June 5th, 1882, constitutes the foundation for any legal right prior to the passage of that Act, which would pass by operation of law to an assignee in bankruptcy.

The hope of receiving anything from the United States, on account of the payment of war rates of insurance, cannot be said to rise to the dignity of a *naked expectancy.* It is not in the nature of an "interest or possibility of interest which may thereafter beneficially arise from the present *vested right.*"

It is not in the nature of a "vested right *ad rem* or *in re,* nor a possibility coupled with an interest, nor a claim growing out of, or adhering to property."

It is not of that species of property upon which an assignment could have *operated as a transfer of property in presenti;* and which is the very test of its passing to the assignee in bankruptcy, or of that which may be assigned by operation of law.

All that might be done with respect to such a shadowy expectancy, would be to enter into a contract concerning the expectancy or possibility *eo nomine,* the evidence of which might be perpetuated, and then the law might frame an interest in respect of the contract, and such a contract might be enforced in equity. In no event could it be enforced except by and through the contract only, and not by reason of its nature as an existing claim or

right. *Carleton vs. Leighton,* 3 *Meriv.,* 667 ; 2 *Com. Dig.* *Grant D, Assignment C ; Comegys vs. Vasse,* 1 *Peters,* 199 ; *Mitchell vs. Winslow, et al.,* 2 *Story,* 630 ; *Bryan vs. Lewis, Ry. & M.,* 386 ; *Dursley vs. Fitzhardinge,* 6 *Ves.,* 260, 261 ; 1 *Benjamin on Sales, sec.* 78 ; *Low vs. Pew,* 108 *Mass.,* 347 ; *Mulhall vs. Quinn,* 1 *Gray,* 105 ; *Hartley vs. Tapley,* 2 *Gray,* 565 ; *Jermyn vs. Moffitt,* 75 *Penn.,* 402 ; *Lehigh Valley R. R. vs. Woodring,* 7 *Central Rep.,* 207 ; *Ex parte Dalby—Re Griffiths,* 1 *Lowell,* 433 and 434 ; *In Re Murrin,* 2 *Dillon,* 120 ; *In Re Sutherland,* 6 *Bissell,* 526 ; *Official Receiver vs. Tailby, L. R.,* 18 *Q. B. Div.,* 29, 30, and *Ex parte Webber, L. R.,* 18 *Q. B. Div.,* 111 ; *In Re Patterson,* 1 *Natl. Bank Reg.,* 125 ; *Mays vs. Manufacturers' Natl. Bank,* 64 *Penna.,* 74 ; *Rugely & Harrison vs. Robinson,* 19 *Ala.,* 404, &c.

The Act of Congress of the 5th of June, 1882, was an act of grace and bounty on the part of the United States.

The very preference created by the Act itself in favor of one class of claims over those of another class, is altogether at variance with any right or trust attaching ; but quite consistent with the idea of an act of sovereign bounty or grace on the part of the United States.

Say the Supreme Court: "A claim having no foundation in law, but depending entirely upon the generosity of the government constitutes no basis for the action of any legal principle. It cannot be assigned. It does not go to the administrator as assets. It does not descend to the heir. And if the government, from motives of public policy, or any considerations, shall think proper, under such circumstances to make a grant of money to the heirs of the claimant, they receive it as a gift or pure donation." *Heirs of Emerson vs. Hall,* 13 *Peters,* 409 ; *Burnand vs. Rodocanachi, L. R.,* 6 *Q. B. D.,* 633 ; *Same Case, L. R.,* 7 *Appeal Cases,* 333 ; *Gillan vs. Gillan,* 55 *Penn. State,* 430 ; *Marshall vs. Means,* 12 *Ga.,* 61.

The suit is correctly brought by the appellee as surviving partner of Stirling & Ahrens, against the appellant,

individually, upon the common count "for money had and received by the defendant for use of plaintiff." This count is said to subserve the purposes of a bill in equity in the discovery of money in the hands of the defendant, and equitably belonging to the plaintiff. 1 *Poe's Pleading and Practice*, secs. 117–124 ; *Heirs of Emerson vs. Hall*, 13 *Peters*, 409 ; *Walton vs. The United States*, 9 *Wheaton*, 656.

William Stirling and Adolph Ahrens, the surviving partners of Stirling and Ahrens, were not adjudged bankrupt as surviving partners of that firm at the time of the adjudication of the bankruptcy of Stirling, Ahrens & Co. This is the only way known to the Courts, if at all, the assets of a surviving partnership may be reached in bankruptcy. *In Re Temple*, 17 *Natl. Bank Reg.*, 345 ; *Marrett, Assignee vs. Murphy, et al.*, 11 *Natl. Bank Reg.*, 131 ; *Briswalter vs. Long*, 7 *Sawyer*, 74 ; *Same Case*, 14 *Federal Reporter*, 153.

ALVEY, C. J., delivered the opinion of the Court.

This action was brought by the plaintiff, the appellee here, as surviving partner of William Stirling and Theodore Ahrens, trading as Stirling and Ahrens, against the defendant Brooks, the appellant on this appeal, to recover money had and received by the defendant to the plaintiff's use. The pleas were, never indebted, and never promised, as alleged. The case was tried before the Court, without the assistance of a jury ; and nearly all of the material facts of the case were agreed upon by the parties. The findings and judgment of the Court below were for the plaintiff, and the defendant has brought the case here on appeal for review.

Both parties, at the trial below, submitted legal propositions for the acceptance and government of the Court, but all such propositions were rejected, and the Court proceeded to state at large its conclusions of fact, and the legal principles applicable thereto, resulting in the judgment for the plaintiff.

It appears that the firm of Stirling and Ahrens was formed in 1852, and continued in active business until the 31st of December, 1867. Adolph Ahrens, the plaintiff, is the sole surviving partner of that firm; but from the 31st of December, 1867, to December 1870, a new firm existed, under the name and style of Stirling and Ahrens, composed of the former members of the firm and George A. Ahrens. In December, 1870, this firm was dissolved, and a new firm formed, under the name and style of Stirling, Ahrens and Company. Subsequently other changes took place in the membership of the firm, though none in the firm name ; and on the 26th of August, 1875, the firm of Stirling, Ahrens and Company, then consisting of William Stirling, Adolph Ahrens and Henry F. Zollickhoffer, committed an act of bankruptcy, and on the 7th of December, 1875, the firm was adjudged bankrupt, by the United States District Court for the District of Maryland. Thereupon, on the 24th of December, 1875, the defendant was appointed assignee in bankruptcy of the bankrupt firm, and of each member thereof individually, and duly assumed the trust.

The firms of Stirling and Ahrens, and Stirling, Ahrens & Co., were largely engaged in commerce in the City of Baltimore, as shippers and general commission merchants, and their shipping trade was carried on between the port of Baltimore and the ports of the West Indies and of South America. And as merchants engaged in the shipping business, the original firm of Stirling & Ahrens, between the dates of the 13th of April, 1861, and April 9th, 1865, paid large sums as extra or enhanced premiums for insurance, properly denominated " war premiums," against loss or capture of vessels and cargoes by Confederate cruisers. The amount thus paid by that firm, within the period just mentioned, over and above the ordinary or peace rates of marine insurance, after deducting for a limited reimbursement received from the insurance companies by

way of dividends, was the sum of $57,162.17, inclusive of interest. Of this amount, the defendant as assignee in bankruptcy of the firm of Stirling, Ahrens & Co., and of the members of that firm, has received, by the judgment and award of the Court of Commissioners of Alabama Claims, as re-established under the Act of Congress of the 5th of June, 1882, the sum of $19,881.31; and it is to recover of the defendant this latter sum that this action is brought.

Without stating subordinate. questions, there are two main or principal questions presented by the record :

First, assuming that the payment of premiums of insurance for war risks constituted such right or claim as would pass to an assignee in bankruptcy, under the late Bankrupt law, whether the plaintiff, as surviving partner of Stirling and Ahrens, the firm that paid the premiums for war risks, can maintain this action against the defendant,— the plaintiff having been a member of the partnership of Stirling, Ahrens & Co., that was adjudged to be bankrupt, though the firm of Stirling and Ahrens never was so adjudged ?

Second, Whether the payments of premiums for war risks, such as are provided to be allowed out of unappropriated moneys of the Geneva award, by the Act of Congress of the 5th of June, 1882, constituted such nature of claim or right in the bankrupt, as to form part of his estate, and to pass to his assignee for the benefit of his creditors, though at the time of the bankruptcy declared, there were no legal means whatever for realizing any such claim ?

We shall consider the second question first; for if we conclude that the claim for payment of premiums, for war risks, was not of a nature to pass to the assignee in bankruptcy for the benefit of the creditors of the bankrupt, we could have no difficulty in holding that the plaintiff, as surviving partner of Stirling and Ahrens, and liable to

account to the representatives of his deceased co-partners, may maintain this action against the defendant.

The case has been very fully and ably argued at the bar, and much assistance has been derived from the discussion. But without attempting to examine in detail all the positions assumed and contended for in argument, we shall direct our attention to what appears to us to be the salient and controlling points of the case.

It is important, in our view, to notice the history of the fund, out of which the claims for payment of premiums for war risks were allowed; how that fund was created, and for what purpose it was originally intended.

The circumstances that led to the negotiation of the Treaty of Washington, of the 8th of May, 1871, between Great Britain and the United States, are matters of public history, and are familiar to us all. Great loss and destruction had been suffered by owners of American shipping, from Confederate cruisers upon the oceans, fitted out in British ports, in violation of the laws of neutrality; and the principal questions for settlement were: 1st, to what extent the duty of neutrality, as defined by the law of nations, required Great Britain to be diligent within her own jurisdiction to prevent the injury; and, 2d, the extent of the damage suffered, for which that government should be liable, by reason of the fact that she had failed to fulfil her duties as a neutral government. The treaty provided for arbitration for the settlement of these questions; but, in advance, it proposed and declared the three celebrated Rules for the guidance of the arbitrators. Consistently with those rules, the Tribunal created by the treaty had full power to decide every question referred to it, and to decide what claims were within the scope of the submission, and for which allowance could be made. Each government made up its case, and presented the same to the Tribunal. In that presented by the United States, the claims were classified, as those for *direct losses* caused by Confederate

cruisers, including those subsequently designated as the "exculpated cruisers;" those for *indirect losses*, including payments for enhanced premiums for war risks ; and those of a miscellaneous nature.    But upon objection on the part of Great Britain to considering the claims for the *indirect losses,* embracing the claims for enhanced premiums paid, such claims were rejected by the Tribunal, and altogether excluded from consideration, for the reason, as stated by the Tribunal, and entered of record, that they "did not constitute, on principles of international law applicable to such cases, good and sufficient foundation for an award of compensation or computation of damages between nations." And this determination and recorded judgment of the Tribunal was accepted and fully acqueisced in by the government of the United States.    The award, dated the 14th of Sept., 1872, was of a gross sum of $15,500,000, in gold, "as the indemnity to be paid by Great Britain to the United States, for the satisfaction of all the claims referred to the consideration of the Tribunal, conformably to the provisions contained in Article VII of the aforesaid treaty."

It thus appears that the claims for *indirect* losses, embracing payment of enhanced premiums for war risks, were rejected as not being within the submission; and therefore no sum whatever was awarded in respect of such claims.    The amount awarded was in respect of other and a different class of claims, recognized as for *direct* losses caused by the Confederate cruisers Alabama, Florida, and their tenders, and the Shenandoah, after her departure from Melbourne, on the 18th of Feb., 1865.

The first Act of Congress, that of the 23rd of June, 1874, providing for the distribution of the award, contemplated the fund as being intended for the satisfaction of claims for losses "directly resulting from damage by the so-called insurgent cruisers," Alabama, Florida and Shenandoah. It was only after all such claims were passed upon, that it was ascertained that there still remained in the Teasury,

of the Geneva award fund, about the sum of $9,500,000, undistributed. Then came the Act of Congress of the 5th of June, 1882, entitled "An Act re-establishing the Court of Commissioners of Alabama Claims, and for the distribution of the unappropriated moneys of the Geneva award." By the 5th section of that Act, two classes of claims are provided for: 1st. For damages directly resulting from acts done by Confederate cruisers, other than those provided for by the eleventh section of the Act of 1874; and, 2nd, for the payment of premiums for war risks, paid after the sailing of any Confederate cruiser. It was under this latter Act, and by the Court of Commissioners re-established thereby, that the money sued for in this case was awarded to the defendant, as assignee in bankruptcy. That judgment, however, has no effect as *res judicata*. At most it could have but a *prima facie* effect; the parties claiming the money being left at liberty to contest the right to it in the appropriate tribunals. *Comegys vs. Vasse*, 1 *Pet.*, 191, 212.

Having thus briefly shown the facts in relation to the Geneva award fund, and in respect to what claims that fund was originally awarded, and by what means the money sued for in this case reached the hands of the defendant, we are brought to the inquiry, as to the effect, if any, of the provision of the late bankrupt law of the United States, upon the right to the money in question. That law (*Rev. Sts. U. S., sec.* 5046,) contained the following provision in regard to the rights and estate of the bankrupt that should pass to and become vested in the assignee for the benefit of creditors:

"All property conveyed by the bankrupt in fraud of his creditors; all rights in equity, *choses in action*, patent rights, and copyrights; all debts due him, or any person for his use, and all liens and securities therefor; and all his rights of action for property or estate, real or personal, and for any cause of action which he had against any per-

son arising from contract or from the unlawful taking or detention, or injury to the property of the bankrupt; and all his rights of redeeming such property or estate; together with the like right, title, power and authority to sell, manage, dispose of, sue for, and recover or defend the same, as the bankrupt might have had if no assignment had been made, shall, in virtue of the adjudication of bankruptcy and the appointment of his assignee, * * * *be at once vested in such assignee."*

Now, what *right* either vested or contingent, existed in the bankrupt, at the date of his bankruptcy declared, to receive reimbursement for the enhanced or war premiums paid by him, during the Civil War? As against whom did any such right, either at law or in equity, exist? If there was in reality no such *right* in the bankrupt, at the time of bankruptcy declared, it is difficult to perceive how the claim of the defendant, as assignee, to the fund in question can be founded in the terms of that provision of the statute just recited. The statute is clear that it was only existing rights that were contemplated by it, and were intended to be transferred to the assignee. But here, the facts show that there was not even a possibility of interest which might thereafter beneficially arise from any *existing vested, or even contingent*, right. And without the existence of a right, the bare possibility that the government might, at some future day, as an act of generosity or benevolence, provide, out of a fund in its control, for reimbursement of war premiums that had been paid, clearly constitutes no part of the assets of a bankrupt's estate. The premiums were voluntarily paid, and they were lawfully received by the insurers for the risks incurred. Indeed, they were the ordinary incidents of war, and of commerce carried on during war. The Confederate government, as a recognized belligerent, was in the exercise of lawful belligerent rights in sending her cruisers upon the ocean; and those who paid extra premiums for in-

surance against the risk of capture or destruction of property, could not, by such payment, impose any obligation either upon governments or individuals to make reimbursement of premiums thus paid. And as the claims for allowance of such extra or war premiums against Great Britain were utterly rejected by the Geneva tribunal it would seem irresistibly to follow that the provision made by the Act of Congress of the 5th of June, 1882, was an act of gratuity, and nothing more. And that being so, we are clearly of opinion that the doctrine or principle of relation cannot be invoked, to give this newly created right under the Act of 1882, relation back to the time of the bankruptcy, and the assignment to the defendant. The doctrine of relation is founded on principles of equity, and is a fiction of law introduced for the attainment of justice. There is no element in this case to require its application.

It has been strongly urged that the cases of *Comegys vs. Vasse*, 1 *Pet.*, 193; *Plater vs. Scott*, 6 *G. & J.*, 116; and *Leonard vs. Nye*, 125 *Mass.*, 455, maintain a different doctrine from that just stated. But we do not so read those cases. In those cases there were existing rights to compensation, in the aggrieved parties, for injuries suffered ; and redress for such injuries had been demanded by the government, as matter of right, and as such provided for by treaty.

In the case first mentioned, the question arose, as in this case, between the bankrupt, who had been discharged under the bankrupt law of the United States of 1800, and his assignees. Vasse, the plaintiff, had been an underwriter on policies of insurance on vessels unlawfully seized and condemned by the government of Spain. The owners of the vessels had abandoned them as for a total loss, which the insurer paid, and he thereby became the successor to the rights of the assured. The sentences of the Spanish prize Courts were, according to settled principle, regarded as conclusive as to the right to the things condemned ;

and, consequently, no claim could exist on the part of the insurer, except as against the government under whose authority the illegal seizures and condemnation took place. Such claim was made, with others, and by the treaty with Spain in 1819, under which the United States acquired Florida, Spain agreed with this government to pay $5,000,000, in full discharge of all the unlawful seizures, but leaving this government to distribute the indemnity. Of this indemnity, Vasse had awarded to him the sum of $8,846, which was paid over by the Treasury to his assignees; and he brought the suit to recover the money as having been received to his use. And upon the case being taken to the Supreme Court of the United States, that Court held, that although the illegal sentences of the Spanish prize Courts were irreversible, the party injured had not lost all right to justice, or his right to claim, upon principles of international law, compensation for the wrongful spoliation of his property; that he had a right to the justice both of his own government and that under whose authority the wrong was done; and therefore this claim of right to compensation passed by the assignment made by the bankrupt to his assignees. That case, it is manifest upon the statement of it, has no analogy to the present, in respect to the nature of the claim upon which the money was received by the assignee.

The case of *Plater vs. Scott* stands upon the same principle as that of *Comegys vs. Vasse*. In the case of *Plater vs. Scott* the money sued for came into the hands of the defendant as insolvent trustee of the plaintiff. The money had been awarded to the plaintiff subsequent to his insolvency, by the board of Commissioners appointed to distribute the fund paid to the United States, under the convention with Great Britain of 1826, as compensation for certain slaves captured and deported during the war of 1812. The slaves, in respect to which the money sued for was allowed, were, at the time of capture and deportation

by the British naval force in the Chesapeake bay, in 1814, the property of the plaintiff. The slaves being private property, and not contraband of war, there was no law of civilized warfare that justified their capture and deportation. Hence the owner, thus wrongfully despoiled of his property, had a valid foundation for a claim against the government, under whose authority the wrong was done, for compensation or indemnity. And as by the insolvent law of this State, then in force, all claims of the insolvent passed to his trustee, the Court held, that the term *claim*, used in the law, was sufficiently extensive and comprehensive, to embrace the claim for compensation for the deported slaves. It could not with propriety be contended, say the Court, "that the lawless deportation of slaves, and plunder of property on our waters during the late war, conferred upon the enemy any right thereto; and the treaty by granting indemnity, furnishes demonstrative proof, that these transactions were contrary to all the usages of civilized warfare."

The case of *Leonard vs. Nye* is not different in principle from that of *Comegys vs. Vasse*, and consequently it has no application to this case. It was an action by the assignee in bankruptcy against the bankrupt, to recover money that had been received by the latter upon the award of the Court of Commissioners of Alabama Claims, under the Act of Congress of June 23rd, 1874. The defendant had presented a claim for damages sustained by the destruction of merchandise belonging to him on board a whaling vessel, destroyed with her cargo on May 27, 1865, by the Confederate cruiser Shenandoah, one of the inculpated cruisers, after her departure from Melbourne, Australia. The claim, therefore, was one contemplated and provided for by the award of the Geneva Tribunal, and therefore, upon the principle of *Comegys vs. Vasse*, passed under the assignment in bankruptcy, and so the Court held.

These cases, therefore, in no manner conflict with the conclusion to which we have arrived. But that conclusion would seem to be well supported, if support were needed, by decisions of the highest authority.

In the case of *Emerson vs. Hall,* 13 *Pet.,* 409, Emerson, Chew and Lorrain libelled a slave ship, and caused her to be condemned, and thereupon they claimed half the proceeds of the ship and cargo ; and that claim was allowed by the Court below. But, on appeal, the decree was reversed by the Supreme Court of the United States, upon the ground that Emerson, Chew and Lorrain, as surveyor, collector, and naval officer of the port of New Orleans, had no right as captors. Emerson and Lorrain died ; and Congress afterwards passed an Act bestowing on Chew and the heirs of Emerson and Lorrain, the one-half of the condemnation money. Hall, as creditor of Emerson, interposed, and claimed that the debt due him should be paid out of the fund received under the Act of Congress ; and the Courts below so ordered. But on error to the Supreme Court of the United States, the order was reversed, upon the ground, that the money received under the Act of Congress was a gratuity to the heirs of Emerson, because of their father's meritorious services. In the course of the opinion, the Court say : "Had Emerson become insolvent and made an assignment, would this claim, if it may be called a claim, have passed to his assignee ? We think, clearly, it would not. Under such an assignment, what could have passed ? The claim is a nonentity. Neither in law nor in equity has it any existence." And further on in the opinion it is said : " A claim having no foundation in law, but depending entirely on the generosity of the government, constitutes no basis for the action of any legal principle. It cannot be assigned. It does not go to the administrator as assets. It does not descend to the heir. And if the government, from motives of public policy, or any other consideration, shall think

proper, under such circumstances, to make a grant of money to the heirs of the claimant, they receive it as a gift or pure donation. A donation made, it is true, in reference to some meritorious act of their ancestor, but which *did not constitute a matter of right against the government.*" And so in this case. The claims for war premiums paid constituted no matter of right as against the government; and the Act of Congress of 1882, which allowed such premiums to be reimbursed to the parties paying them out of the Geneva award fund, was an act simply of gratuity, based upon no antecedent obligation whatever.

There are other cases that strongly support the proposition that the provision made by the Act of Congress of 1882 is a mere gratuity; as that of *Gillan vs. Gillan,* 55 *Penn. St.,* 430, and that of *Burnand vs. Rodocanachi,* 6 *Q. B. Div.,* 633, on appeal, and the same case affirmed in the *House of Lords,* 7 *App. Cas.,* 333. But we forbear extending this opinion by stating the facts and reasoning of those cases.

There was a proposition made to the Court below that, in the event of judgment being entered for the plaintiff, the defendant was entitled to have allowed or recouped, of the money in his hands, such reasonable amount as would be sufficient "to defray the expenses ordinarily incident to the prosecution of such a claim," (referring to the claim prosecuted by the defendant, as assignee, before the Court of Commissioners of Alabama Claims,) "including compensation to counsel for conducting the suit against the United States."

The Court below refused to allow any such recoupment, and we do not perceive how it could have done otherwise. There was no evidence offered whatever as to what was the reasonable amount to be allowed. And as to allowance for counsel or attorney's fees, the Act of Congress of 1874, sec. 18, adopted by the Act of the 5th

of June, 1882, provided, that, when the judgment ᶜwas rendered for the claimant, the Court should, upon motion of the attorney of the claimant, "allow out of the amount thereby awarded, such reasonable counsel and attorney's fees to the counsel and attorney employed by the claimant *as the Court should determine was just and reasonable,* as compensation for the services rendered the claimant in prosecuting such claim; which allowance should be entered as part of the judgment in such case, and should be made specifically payable as a part of said judgment for indemnification to the attorney or counsel, or both, to whom the same should be adjudged." It does not appear in this case, whether any such application was made to the Court of Commissioners for allowance for counsel or attorney's fees, or, if such application was made, what was the determination of the Court in regard thereto. It was to that tribunal that application should have been made; and the Court below was quite right in refusing to exercise a power that had been conferred upon another tribunal.

Upon review of the whole case, as presented upon the record, this Court is of opinion that the judgment of the Court below must be affirmed.

*Judgment affirmed.*

(Decided 5th January, 1888.)