ENOS N. TAFT, as Assignee, Appellant, *v.* FERDINAND A. MARSILY, Impleaded, etc., Respondent.

*It seems* that money collected by the government from a foreign nation, by treaty or otherwise, to be paid to its citizens as indemnity for loss or injury caused by the action of the foreign government, is not a bounty, but is property, and a right in a sum so awarded is an interest, legally capable of being assigned by the owner of the property destroyed or injured.

This right to assign exists before the government of the owner has taken steps toward securing to him an indemnity for his loss.

No legal claim ever arose or existed against the government of the United States in favor of claimants for extra premiums paid for insurance against capture or destruction of property by Confederate cruisers, as such claims were rejected by the tribunal of arbitration, and the money paid by Great Britain under the "Geneva" award did not include any compensation therefor; no trust, therefore, in favor of such claims was impressed upon the fund on its receipt by the Federal government, nor was there any moral obligation on its part to pay them.

Accordingly, *held*, that the provision for the payment of such claims out of the unexpended balance of said award in the hands of the government, made by the act of congress of June 5, 1882, was a gratuitous act of the government, and the claimants received the amount awarded as a gift.

In an action brought by plaintiff, as assignee in bankruptcy of E. and M., who were copartners, and as such paid certain extra premiums for insurance against capture or destruction of the firm property by Confederate cruisers, to recover an amount awarded and paid to M. after the assignment, upon a claim made by him and E. under said act, *held*, that, as by the assignment, the assignee succeeded only to rights and interests the assignor had at the time of the making thereof, no right to or interest in the claim passed to the assignee; and, therefore, the action was not maintainable.

Reported below, 47 Hun, 175.

(Argued April 25, 1890; decided June 3, 1890.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, entered upon an order made January 23, 1888, which reversed a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term, and ordered a new trial.

Prior to August, 1867, the defendants Englehorn and Marsily were copartners in business, and, as such copartners,

between April 13, 1861, and April 9, 1865, paid to certain underwriters of marine insurance, extra premiums for insurance against capture or destruction of property of the firm by Confederate cruisers.

In August, 1867, said defendants were, upon their own petition, jointly and severally adjudged bankrupts, and John Todd was appointed their assignee, and on August 25, 1867, the usual assignment in the form prescribed by law was executed and delivered to said assignee by said defendants.

In January, 1883, pursuant to an act of congress, entitled "An act re-establishing the Court of Commissioners of Alabama Claims and for the distribution of unappropriated moneys of the Geneva award," approved June 5, 1882, said Englehorn and Marsily filed a claim in the court aforesaid to recover the amount of premiums paid as aforesaid, and in May, 1884, a judgment therefor was rendered in said court in favor of said defendants for $2,788.32, and in August, 1884 (the unappropriated moneys being insufficient to pay said award in full), a draft for $975.21 was issued by the treasurer of the United States in payment of the said judgment, and is now in the hands of the defendant Marsily. This action was brought by the assignee in bankruptcy of said defendants to recover the amount of said draft.

The trial court found the foregoing facts, and as conclusions of law that, by the assignment in bankruptcy, all the right, title and interest in and to said claim for extra premiums, passed to and became vested in the assignee; that the said Englehorn and Marsily had no right to receive payment of said judgment or of said draft, and that the same belonged to the plaintiff, and all sums payable thereon should be paid to the plaintiff, and gave judgment accordingly. Todd having died, the plaintiff was appointed his successor.

*Henry D. Hotchkiss* for appellant. The United States undertook to represent the claims for damages of all of its citizens and used them as items of its national demand; but it was to the interest of the government, in order to limit its

own international obligations, that the tribunal should decide against it in respect to the indirect losses. (Vattel's Law of Nations, chap. 7; 13 C. R. 3812, 4182.) That it might be free to act for the best interests of the nation without sacrificing the claim of any of its citizens, it accepted the award, but stipulated there should be no committal of this government as to the distribution of it. (13 C. R. 3813, 3841.) The trust imposed upon the United States when it received the award was for the benefit of those whom it should determine were the sufferers. (Hackett, Geneva Award Act. 180; The Peggy, 1 Cranch [U. S.], 110; Report of Sen. Com. 1886; 13 C. R. 3821, 3854, 3871, 4813.) The action of the government in directing by the act of 1882 the payment of the war premium men was based upon the theory that the undistributed portion of the award represented direct losses paid by underwriters from premiums on war risks. (13 C. R. 3841, 3849, 3853, 3884, 3890, 4138, 4153, 4154.) Money collected by the government from a foreign nation by treaty or otherwise, and paid out to the citizens of the government receiving it as indemnity for loss or injury caused by the action of the foreign government, is not a bounty, but is property which will pass to an assignee in bankruptcy or an executor of the person whom it is sought to indemnify. (*Comegys* v. *Vassee*, 1 Pet. 193; *Phelps* v. *McDonald*, 99 U. S. 298; *Leonard* v. *Nye*, 125 Mass. 445; *Milnor* v. *Metz*, 16 Pet. 223; *Rustonyie* v. *Queen*, L. R. [1 Q. B. Div.] 497; *Pierce* v. *Stidworthy*, 4 N. E. Rep. 499; *Grant* v. *Bodwell*, 78 Me. 463.) The copies of the petition of the defendants in the Court of Commissioners of Alabama Claims and the docket of that court were properly received in evidence. (23 U. S. Stat. at Large, 33, 34; Code Civ. Pro. § 944.)

*D. M. Porter* for respondent. There is no conflict of evidence, and only a question of law was presented in the courts below. (*Heard* v. *Sturgis*, 146 Mass. 545; *Kingsbury* v. *Mattocks*, 81 Me. 310; *Brooks* v. *Aherns*, 68 Md. 212; *In re Cooley*, 19 N. Y. S. R. 241; 47 Hun, 175; *Emerson* v. *Hall*,

13 Pet. 409 ; *Gillan* v. *Gillan,* 55 Penn. St. 430 ; *Burnand* v. *Rodoconachi,* L. R. [6 Q. B. Div.] 633 ; 44 L. T. 538 ; 7 App. Cas. 333 ; *Campbell* v. *Mallett,* 2 Swan. 551, 570 ; *McLean's Case,* Rep. Clerk of Ala. Cl. 112.) The court erred in receiving in evidence a certified copy of the petitions filed by the defendants Englehorn and Marsily with the Court of Commissions of Alabama Claims. ( *Williams* v. *Ingersoll,* 89 N. Y. 508; *Fairbanks* v. *Sargent,* 104 id. 108 ; *Krekeler* v. *Thaule,* 73 id. 608.)

Brown, J. The plaintiff was not a party to the proceeding before the Court of Commissioners of Alabama Claims and the judgment of that tribunal making an award to the defendants is not binding upon him.

The only effect of that judgment was to fix the amount and validity of the claim as against the United States, and set apart and identify the fund for the benefit of whoever might ultimately prove to be entitled to it under the proper construction of the Statute. ( *Comegys* v. *Vasse,* 1 Pet. 193.)

It was said in the case cited that "the validity and amount of the claim being once ascertained by their " (the Commissioners) " award, the fund might well be permitted to pass into the hands of any claimant and his own rights as well as those of all others who asserted a title to the fund be left to the ordinary course of judicial proceeding in the established courts, where redress could be administered according to the nature and extent of the rights or equities of all the parties."

An assignee in bankruptcy succeeded only to rights and interests which the bankrupt had at the time of the assignment, and had no right to the possession of property which the bankrupt acquired by title subsequent to the assignment. (U. S. R. S. § 5044.)

He became vested with " all the bankrupt's estate, real and personal, all rights of the bankrupt in equity and choses in action, all debts due him or to any person for his use, all rights of action for property or estate, real or personal, and for any cause of action which he had against any person,

arising from contract or from the unlawful taking or detention or injury to the property of the bankrupt," etc., etc. (U. S. R. S. § 5046.)

This language is very general and comprehensive and covers every description of vested right and interest attached to and growing out of property.

The question that lies at the foundation of this action is, therefore, whether at the time of the assignment the bankrupts had any right to an indemnity for the extra premiums they had paid for insurance. If they had, if the government of the United States, to whom the fund awarded by the Geneva Tribunal was paid, held it or any part of it in trust for those possessing claims of a character similar to the defendants, then the claim was in the nature of property and passed to the assignee.

It has been decided in many cases that money collected by the Government from a foreign nation by treaty or otherwise, and paid to its citizens as indemnity for loss or injury caused by the action of a foreign government, is not a bounty, but is property, and that a right in a sum so awarded is an interest legally capable of being assigned by the owner of the property destroyed or injured, even before his own government has taken any steps toward securing to him an indemnity for his loss. (*Comegys* v. *Vasse*, 1 Pet. 193 ; *Phelps* v. *McDonald*, 99 U. S. 298 ; *Erwin* v. *United States*, 97 U. S. 392; *Leonard* v. *Nye*, 125 Mass. 455 ; *Milnor* v. *Metz*, 16 Pet. 223.)

But, if the settlement of the claim depended upon the bounty of the government and if the draft in question was a gratuity solely, then it belongs to the defendant, and the assignee has no title or claim thereto. (*Emerson* v. *Hall*, 13 Pet. 409 ; *Gillan* v. *Gillan*, 55 Penn. St. 430.)

And the precise question presented in this case has been decided adversely to the plaintiff's contention in Massachusetts, Maryland and Maine. (*Heard* v. *Sturgis*, 146 Mass. 545 ; *Kingsbury* v. *Mattocks*, 81 Me. 310 ; *Brooks* v. *Ahrens*, 68 Md. 212.)

The class of cases cited above, of which *Comegys* v. *Vasse* was the pioneer in this country, and which held that the right to indemnity for losses arising out of unjust capture passed by assignment before steps had been taken by the government to secure payment for such loss, was based upon the principal that the right of indemnity whether against the captors or the sovereign, whether remedial in his own courts or by his own extraordinary interposition and grants, upon private petition or upon public negotiation, is a right attached to the ownership of property itself and passed by cession to the use of the ultimate sufferer.

Justice STORY, in considering the character of this right in *Comegys* v. *Vasse* says, " It is not universally, though it may ordinarily be one test of right, that it may be enforced in a court of justice.

" Claims and debts due from a sovereign are not ordinarily capable of being so enforced. It does not follow because an unjust sentence is irreversible, that the party has lost all right to justice or all claim upon principles of public law to remuneration. With reference to mere municipal law, he may be without remedy, but with reference to principles of international law he has a right both to the justice of his own and the foreign sovereign. The very ground of the treaty is that the municipal remedy is inadequate and that the party has a right to compensation for illegal capture by an appeal to the justice of the government. The right to compensation in the eye of the treaty was just as perfect, though the remedy was merely by petition, as the right to compensation for an illegal conversion of property in a municipal court of justice.

" The case of *Randal* v. *Cockran* (1 Ves. Sr. 98) stands upon the true ground. It considers the right of indemnity as traveling with the right of property."

In *Leonard* v. *Nye*, Chief Justice GRAY said : " The claim for the destruction of property of citizens of the United States by the Alabama, etc., were claims for which the owners of the property destroyed were justly entitled to compensation from Great Britain, although they could not obtain these

rights in the ordinary course of judicial proceedings, but only by petition to the British government, or through the interposition of their own government. Compensation was demanded of Great Britain as a matter of right, and, as such, awarded by the decision of the tribunal of arbitration created by the treaty. The act of congress for the disposition of the moneys received from Great Britain pursuant to that decision, provided for their application to the payment of claims directly resulting from the damage caused by the insurgent cruisers, and the sum awarded was upon such claim. It must, therefore, be treated as awarded and paid to him by reason of his interest in the property so destroyed and of his right to compensation for its destruction."

In *Phelps* v. *McDonald*, Justice SWAYNE said : "If the demand be just and recognized as valid by the law of nations the claimant, or his government, if the latter chooses to do so, may press it upon the attention of the alien government."

And in *Bachman* v. *Lawson* (109 U. S. 659), it was held that a claim successfully prosecuted before the Court of Commissioners of Alabama Claims, under the act of congress of June 23, 1874, was not a claim created by that act, but was an existing right prior to the treaty of Washington.

These citations are sufficient to show that the decisions in the class of cases cited rested upon the principle that the party suffering the loss had, from the time he sustained the injury, a valid, legal claim against the government or nation whose acts or negligence had caused or permitted the loss. Not a claim, of course, enforceable under municipal law in the ordinary courts or tribunals, but one which, under the broad principles of justice and of international law, entitled him to recognition by his own and the offending nation. And when the offending nation recognized the claim and compensation was allowed and paid to our government, it became the trustee of the fund for the parties having equitable title to the reimbursement. (*Gracie* v. *N. Y. Ins. Co.*, 8 Johns. 237–245 ; 1 Pet. 193, 215.)

These cases, however, do not aid the appellant in the case now under discussion.

In view of the fact that the Geneva Tribunal rejected what were commonly known as "indirect claims," we think it is not important to inquire whether, under the law of nations, the persons who paid the extra premiums for insurance had any claim therefor against Great Britain.

Of course there was no claim against the government of the United States and could be none until collection had been made from Great Britain.

It is very doubtful whether the treaty of Washington contemplated a reference to arbitration of "indirect claims." It was therein provided " that all the said claims growing out of *acts* committed by the aforesaid vessels, and generically known as the 'Alabama claims,' shall be referred to a tribunal of arbitration.    *    *    *

" The said tribunal shall first determine as to each vessel separately whether Great Britain has, by any act or omission, failed to fulfill any of the duties set forth in the foregoing three rules or recognized by the principle of international law *    *    * and shall certify such fact as to each of said vessels." In case the tribunal found that Great Britain had failed to fulfill any duties as aforesaid, it was empowered to award a sum in gross to be paid by Great Britain to the United States " for all the claims referred to it."

These provisions would appear to exclude the consideration of all claims for loss, except such as were caused by some act committed by some one of the insurgent cruisers.

But it is not necessary for us to express any opinion upon that question.

The claims for extra premiums paid for insurance were presented by the government of the United States to the Court of Arbitration under the treaty, and that court decided that these claims did not constitute, upon the principles of international law applicable to such cases, good foundation for an award of compensation between nations, and should, upon such principles, be wholly excluded from the consideration of the tribunal

in making its award. In presenting the claims for extra premiums of insurance to that tribunal, the government of the United States acted as the agent for the claimants, and they must accept the decision of that court as final and conclusive upon the question of their right to enforce their claims against the government of Great Britain. At least this must be so until the high contracting parties reopen the subject and a different result shall be declared.

The money paid by Great Britain under the award did not include any compensation for claims for enhanced insurance, and no trust in favor of such claims was impressed upon that fund, upon its receipt by our government.

No legal claim, therefore, ever arose or existed against our own government in favor of such claimants, and we are unable to see how there was any moral obligation resting upon the United States to appropriate any part of the award to the payment of claims that had been rejected by the Court of Arbitration. Congress, in legislating upon this subject, clearly proceeded upon this view. The act of June 23, 1874, creating a court for the adjudication and disposition of the moneys received under the award, limited the powers of the court to the consideration of claims " directly resulting from damages by the so-called insurgent cruisers and their tenders," and to claims of insurers who should show to the satisfaction of the court that " the sum of its or his losses, in respect to its or his war risks, exceeded the sum of its or his premiums or other gains upon or in respect to such war risks."

In enacting this law congress did not know but that the claims therein provided for might exhaust the whole fund, and there was a clear recognition by this act that other claimants not mentioned in the act had no right to share in the distribution of the money.

There was, however, a large surplus left in the treasury after the payment of the claims mentioned in the act of 1874, and by the act of Congress of June 5, 1882, the Court of Commissioners of Alabama Claims was re-established and the distribution of the unappropriated moneys provided for. Two

classes of claims were designated which the court were empowered to examine and allow; claims arising from payment of premiums on war risks were made the second class, and payment thereof was to be made only from the residue of the fund that should remain after all claims of the first class were paid.

We find in this act again, in the postponement of the payment of these claims to those of another class, a recognition of the fact that no claim existed against the government in favor of the claimant for enhanced insurance, and that no moral obligation rested upon the government to recognize them.

The learned counsel for the appellant seeks to have us draw a different conclusion from the debates of congress preceding the enactment of the law last referred to, but we are unable to do so, and find our own conclusion strengthened by the fact that congress hesitated as to what class of claims it should apply this unappropriated fund to, and, among others, considered the insurance companies and the general treasury itself.

The history of these claims from the treaty of Washington to the final act of Congress in 1882, leads us to the conclusion that they were not losses which the government of Great Britain, upon the principles of the law of nations, was under any obligation to recognize and compensate, and, having been rejected by the court created for their consideration, no claim ever arose in favor of any person holding such claim against the government of the United States, and no trust was created in their favor on payment of the award of Great Britain, and that the provision for their payment made by the act of congress on June 5, 1882, was a gratuitous act of the government, and the claimants received the sum awarded as a gift or pure donation.

It is of no consequence that the award to the claimants was made from the unexpended balance of the Geneva award. Nor is it of importance to determine to whom that balance belonged so long as it was not impressed with a trust in favor of the claimants who paid enhanced premiums of insurance.

Congress took the responsibility of giving it to them, but that act did not make it legally more applicable to the payment of that claim than it did to the payment of the losses of the insurance companies, or to the loss arising from the transfer of our commerce to the protection of the British flag, or to the general expenses arising from the prolongation of the war and the suppression of the rebellion.

The case stands precisely as though the United States government had donated a sum of money to persons who had suffered by reason of the war when no legal claim against the government existed in favor of the recipients.

Such being the fact, no title passed to the assignee in bankruptcy. It was said in *Emerson* v. *Hall* (13 Pet. 409), "a claim having no foundation in law, but depending entirely upon the generosity of the government, constitutes no basis for the action of any legal principle. It cannot be assigned; it does not go to the administrator as assets; it does not descend to the heir. And if the government, from motives of public policy or any other circumstances, shall think proper, under such circumstances, to make a grant of money to the heirs of the claimant, they receive it as a gift or pure donation." To the same effect is *Gillan* v. *Gillan* (55 Penn. St. 430).

We concur generally in the views expressed in the cases cited from the reports of Massachusetts and other states, which considered the precise question presented on this appeal.

The order should be affirmed and judgment absolute rendered against the appellant, with costs.

All concur.

Order affirmed and judgment accordingly.