Nott, J.,
delivered tbe opinion of tbe court.
Tbis suit is a congressional case for quartermaster stores and commissary supplies taken by military authority for tbe use of the Army in 1862, near Bowling Green, Ky. Tbe peculiarity of the case is that it is brought by tbe purchaser of tbe claim in bankruptcy proceedings, and be, and not tbe owner of tbe property, appears as tbe only party in interest.
Three things concerning tbe assignment of claims against tbe Government may be regarded as well settled:
(1) That such claims as are cboses in action upon which a suit can be maintained as a matter of legal right, if there be a jurisdiction, and in which “there is no element of a donation in tbe payment ultimately made” (Phelps v. McDonald, 99 U. S. R., 298), pass in bankruptcy and may be prosecuted by tbe assignee or by tbe purchaser in bankruptcy proceedings. McKay’s Case (27 C. Cls. R., 422); Burke’s (13 id., 241.)
(2) That tbe title to what is known as abandoned and captured property, not having been divested by capture, a claim for tbe proceeds in tbe Treasury' is a cause of action which passes in bankruptcy, although no jurisdiction exists at tbe time in which it can be prosecuted. Klein’s Case (13 Wall. R., 128); Erwin’s (97 U. S. R., 392).
(3) That a mere expectancy, a claim founded on no legal right known to courts of law or equity, a claim which is but an appeal to the clemency of Congress for the redress of an injury, where there is no obligation on the part of the Government, and the granting of relief is purely a matter of legislative discretion, can not be regarded as property and does not pass in bankruptcy. Dockery’s Case (26 C. Cls. R., 148); Heard v. Sturgis (146 Mass., 545); Taft v. Marisly (120 N. Y., 474); Brooks v. Ahrens (68 Maryland, 212); Kingsbury v. Mattocks (81 Maine, 310); Estate of Moore (26 C. Cls. R., 254); Heirs of Emerson v. Hall (13 Peters, R. 409, 415).
*514 But it must be conceded that since the decision of the Supreme Court in Williams v. Heard (140 U. S. R., 529), overturning the concurrent decisions of four of the leading judicial tribunals of the State judiciary upon the same point, the last rule is not easy of application.
The subject of the action was one of the Alabama claims. The Supreme Court held that “the sum awarded by the tribunal of arbitration at Geneva, when paid, constituted a national fund,, in which no individual claimant had any right, legal or equitable, and which Congress could distribute as it pleased,” but that, “nevertheless, there was at all times a moral obligation on the part of the Government to do justice to those who had suffered in property.”
What is a moral obligation on the part of the Government is a question in ethics which different consciences will answer in different ways, and which ordinarily the legislative power alone must determine. The Supreme Court in the same case says that a pension claim for disability is not assignable in bankruptcy; that it is “personal and not susceptible of passing by will or by operation of law.” Yet no one will ever deny that if a government by statute should assure soldiers at the time of their enlistment that in the event of their incurring disabilities they should receive pensions, a moral obligation of the most unequivocal character would require that a fund be provided to pay those who suffered.
The real distinction between the Alabama claims and pension claims is probably this, that there the Government had in custody a fund which was not morally its own, a fund which had been paid to it as an indemnity for depredations which had been committed by another belligerent on American com- ‘ merce, the right of distribution being lodged in its discretion, and the rights of distributees being in abeyance until its discretion should be exercised. The court is careful to say that the rights so assignable in bankruptcy “were rights growing out of propertyThe exercise of the legislative discretion gave efficacy to existing rights; “but,” says the court, “the act of Congress did not create the rights.”
It may be urged that between the Alabama claims and those of loyal citizens in the seceded States a very strong analogy exists; that the last represent “rights growing out of property ;” rights “not enforcible until after the passage of an act *515 of Congress,’’but not created by tbe act; claims for private property taken for public use from loyal adherents of the Government, concerning which “there was at all times a moral obligation on the part of the Government to do justice to those who had suffered in property. ” (Id., p. 541.)
While acknowledging the strength of the analógy, this court adheres to the opinion that a claim for property which was enemy’s property in enemy’s territory, and was taken by the military authorities in the exercise of the lawful right of a belligerent, is not a claim possessing an attribute of property; that it was not a part of the bankrupt’s estate, legal or equitable; but that it was like a pension claim, personal, dependent upon the individual loyalty of the individual sufferer, and the clemency of Congress. With regard to claims for property taken in like manner from citizens within States which were never proclaimed hostile territory there may be a Constitutional obligation.
In probably hundreds of the Congressional cases which have come into this court for quartermaster stores and commissary supplies taken for the use of the Army in the seceded States during the civil war, there have been, assignments in bankruptcy. In such cases this court has uniformly regarded them as belonging to the third class, and the claim as still that of the former owner of the property; and Congress have uniformly given relief accordingly.
The claimant now asks the court to hold that a claim for such stores and supplies, taken for the use of the Army in the State of Kentucky, did pass to the assignee in bankruptcy and is now held by the purchaser in bankruptcy proceedings. Hence there is presented this question, whether there is a fourth class of claims, in which the original claimant whose property was appropriated by military authority in loyal territory possessed a legal right which could pass in bankruptcy, leaving him after assignment not entitled to seek redress. It is manifest that if a distinction can be made between this case and those of the third class, before referred to, that distinction must rest upon the fact that this is a claim for property taken in a State which did not secede, and which can not be regarded as hostile territory, and in which property taken for the use of the Army shall not be regarded as enemy’s property.
This case is not to be confounded when considering the facts *516 with that of an alien in belligerent territory. It is true that where a citizen has gone into a foreign country and is possessed of property there, and war ensues between that country and his own, his property is stamped with the character of the country in which he has placed it, and he can assert no valid demand upon his own government for either seizure or destruction. The facts are otherwise here. Here the property appropriated never was in a foreign country; the State never was stamped as hostile territory; the locus was within the United States military lines; the taking was in a manner deliberate and for public use and in no sense incident to the ravages of war.
So far as cases arising in the seceded States are involved the question seems clear. The Supreme Court has ascribed to the civil war the characteristics of international belligerency; all persons on one side of the line were enemies of all persons on the other; all persons in hostile territory must be regarded as hostile; the Government might enter into express contracts with the inhabitants as any belligerent power might, but no contract could be implied from the seizure, use, or destruction of property which the law regarded as hostile. Nevertheless there was a large class of persons in the seceded States who could say that they were hostile only in name; that in fact they were citizens and not enemies, adherents of the de jure and not of the de facto government. In the words of Chief Justice Waite (Young v. The United States, 97 U. S. R., 61), While all residents within the Confederate territory were in law enemies, some were in fact friends.” It is this class whose claims may be transmitted by a Congressional committee under the Bowman Act, but they may be transmitted merely for investigation; no right of action is recognized by Congress nor known to the law.
It may be thought that if property was taken by the Army for use, and used in a State which never professed allegiance to the Confederate government, and which was never proclaimed to be in insurrection by the President, the act was a taking of private property for public use, from which a contract must be implied; that an action might have been brought on this implied contract, and consequently that the claim is now barred by the statute of limitations.
But the statute of limitations only runs against a right of *517 action. The Act 4th July, 1864 (13 Stat. L., p. 381), removed from the jurisdiction of this court all cases of property appropriated by the Army or Navy engaged in the suppression of the rebellion, and the statute extended to the loyal as well as to the insurrectionary States. The Supreme Court, moreover, has held that the term “ appropriation,” as used in the act, is a term of “the broadest import,” extending to the acquisition of property by an express written contract. (Filor's Case 9 Wall., R., 45.) In such cases the statute of limitations did not attach to the claim, because it only attaches to demands which may be prosecuted in this court. In other words, there might be a constitutional right to redress, and a valid chose in action without there being a forum in which it could be prosecuted. Eedress in such cases could be sought only through the Quartermaster-General, the Commissary-General, and Southern Claims Commission, or in Congress; and such claims now can only reach this court through the intervention of a House or committee of Congress under the Bowman or Tucker Act. “ It is true,” said Mr. Justice McLean, in 1839, “the payment of a debt can not by enforced against the Government by suit; but claims against it are not the less legal or equitable on that account.” (Heirs of Emerson v. Hall, 13 Peters R., 409, 412.)
The Supreme Court has also decided in the case before cited (Erwin’s) that an equitable title to the proceeds of captured property passes to the assignee in bankruptcy, though there be no jurisdiction in which the purchaser can seek redress and though the jurisdictional period for prosecuting such claims had expired at the time of the assignment.
Does the case of a loyal citizen in one of the nonseceding States come within the intent of this decision ? Has he a valid demand of a legal character against the United States which will pass by assignment in bankruptcy, notwithstanding the fact that his claim is expressly excluded from the jurisdiction of this court because the manner of taking his property was by “ appropriation ” by the Army, and not through the medium of the civil authority of the Government?
In view of these legal distinctions the court is of the opinion that a differencé exists between this case and those in which the property was seized in hostile territory, and that this difference makes it the duty of the court to report the case to Congress, it being at the same time understood that the claim *518 ant’s right to relief in Congress is not adjudicated by the court and will remain a question of legislative discretion.
The order of the court is that the findings of fact now'filed be reported to Congress with this opinion.