Mr. Justice Cox
delivered the opinion of the Court:
The bill in this case is filed for the purpose of having the court determine the proper distribution of one of the French Spoiliation awards, under Chap. 540 of the laws of the Second Session, Fifty-First Congress, entitled, “an act making appropriations to supply deficiencies in the appropriations for the fiscal year ending June thirtieth, eighteen hundred and ninety-one, and for prior years, and for other purposes,” 26 U. S. Stat- at R., 862.
One Caleb Gardner originally held the claim, and by his last will and testament he gave and bequeathed all the residue of his estate to his two sons, Wm. Gardner and Samuel F. Gardner, and his daughters, Eliza Gardner, since Mrs. Phillips, and Mary Clarke. His daughter, Mary Clarke, was a half-sister’ of the others. Mrs. Clarke died, leaving descendants who are parties to this suit. Mrs. Phillips also died, but without children, and left a will by which she gave the whole of her estate to her two brothers, Wm. and Samuel Gardner, leaving out her half-sister, Mrs. Clarke. In order to prosecute this claim, Wm. F. Gardner took out letters of administration on the estate of Caleb Gardner and presented this claim in the Court of Claims and obtained an award, an appropriation was made, and the money has been collected by him. He paid one-fourth of the claim to the descendants of each of the sons and to the administrator of Mrs. Clarke, but a question has arisen as to the disposition to be made of the other one-fourth, which would have gone to Mrs. Phillips'if she had survived. The children of her two brothers claim this as a part of the estate of Caleb *264 Gardner by virtue of his will, and of Mrs. Phillips’ will bequeathiilg her share of the estate to them, and that this one-fourth must therefore be divided between them. On the other hand, the descendants of the half-sister, Mrs. Clarke, claim that the appropriation was made by Congress not in payment of a legal claim which was recognized as the property of Caleb Gardner, but rather as a gratuity or bounty, and that it is lim • ited to the next of kin of the original claimant, and the next of kin of Caleb Gardner are the descendants of Mary Clarke, as well-as those of the two brothers. The only question, therefore, is whether this one-fourth shall be divided into three parts — two parts among the descendants of the two sons and one among the descendants of Mrs. Clarke, as the latter claim; or, shall be divided into two parts, one to the descendants of each of the brothers. The case, therefore, involves some interesting questions as to the nature of these claims and the intention of Congress in making the appropriation.
A citizen of this country who suffers a wrong at the hands of a foreign nation does not thereby acquire a direct individual claim against that nation. He has a right to appeal to his own Government to obtain reparation for him. It makes a claim in its own name, as a national or international one, for a wrong committed against it in the person of its citizens, whom it is bound to protect. It is the sole judge of the propriety and expediency of making the demand. If it shall deem it proper, either on grounds of right or public policy, not to make the demand, this does not give him a cause of action against his own Government. If, however, his Government does demand and receive the indemnity, recognizes the private claim and provides for its adjudication and payment, then the question arises, who is entitled to the money? When changes have taken place in the condition of the original claimant or that of his estate, as where he is dead or has become bankrupt, etc., then the courts have held that the appropriation of the money to pay the claim is not to be treated as a mere gratuity, but as payment of a claim which’ was property of some kind in the hands of the owner. As the courts say, it was, at least, a possibility; and, therefore, when the original claimant *265 became a bankrupt before an award was made, so that an assignment of his estate took place by operation of law, the courts have held that the assignment carried with it this kind of claim, and the bankrupt assignee, instead of the original claimant, was the party entitled to payment. And so, also,, where the claimant has died, his personal representatives-have been held entitled to prosecute and recover the claim. And this is about as far as the courts have gone in determining the rights of a party who has suffered an injury at the hands of a foreign government. Some of these principles will be found stated in several cases by the Supreme Court, as, for example, in the cases of Key vs. Frelinghuysen, 110 U. S. 71, and Williams vs. Heard, 140 U. S., 529.
The first case in that court in which a question of this kind arose was that of Comegys et al. vs. Vasse, 1 Peters, 193. In the treaty between the United States and Spain, of 18x9, by which the territory of Florida was acquired by this Government, it was stipulated, on the part of the United States, that this Government would assume and pay certain claims of its citizens against Spain, for depredations by Spanish cruisers upon their shipping, and would appoint a commission to examine and adjudicate-the claims.
An award was made in favor of a-claimant, by the Commission so appointed. In the meantime, the claimant had become bankrupt, and his estate had been assigned to his bankrupt assignee, and this assignment was held to carry with it the claim against Spain. A similar ruling was made in the much later case of Phelps vs. McDonald, 99 U. S., 298, which related to a claim against the United States growing out of the seizure of property of a British subject during the late war, and which was adjudicated by the British Claims Commission under the Treaty of Washington, and this claim also was held to have passed to the bankrupt assignee of the original claimant.
Doubtless the same ruling would have made as to claims-against Mexico provided for in the treaty of Guadaloupe Hidalgo, of February 2, 1848, by the 15th Article of which-the *266 United States, exonerating Mexico from all claims of their citizens, undertook to make satisfaction for the same.
But the French Spoiliation Claims would seem to stand upon an entirely different footing.
It is well known that these claims grew out of depredations on our commerce and illegal seizures and condemnations of vessels and cargoes, by the French, during the hostilities between France and Great Britain before the year 1800. These wrongs caused a great irritation in this country and led to a condition of quasi warfare between the two couutries. This government made a claim for reparation for these wrongs, as an international wrong, and it was met with a counter claim, on the part of France, growing out of the treaty of alliance between France and the United States, of 1778, whereby the United States guaranteed to France security of her possesions in North America. At length, in September, 1800, a treaty was made between the two countries for the purpose of settling all matters in controversy between them by which, among other things, the two governments mutually renounced these opposing claims. The United States did not receive any money to be applied to these claims of its injured citizens, and did not stipulate, as in the treaty with Spain, to assume and pay the claims, but it simply renounced and abandoned its claim as a nation, against France, in consideration of a similar renunciation, by France, of a very troublesome claim against the United States.
The claimants who had suffered the grievances before mentioned thereupon took the ground that the action of our Government amounted virtually to an appropriation of their property to the public use and demanded compensation of the United States. Their claims have been before Congress for many years, and have been often favorably reported on, as well as acted on, in one or the other House, and even in both houses, but no act in relation to them has become a law, by which they are recognized as valid claims against the United States. The nearest approach to it was made by the Act of January 20, 1885, 23 Statutes at Targe, p. 283, which *267 provides for submitting to the Court of Claims the claims of persons who claim indemnity from the -French Government “arising out of illegal captures, detentions, seizures, condemnations and confiscations prior to the ratification of the convention between the United States and the French republic, concluded on the 30th day of September, 1800.”
The act further provides “that the court shall examine and determine the validity and amount of all the claims included in the description above mentioned, together with the ownership,” &c. “And they shall decide upon the validity of said claims according to the rules of law, municipal and international, and the treaties of the United States applicable to the same, and shall report all such conclusions of fact and law as, in their judgment, may affect the liability of the United States therefor.”
Section 6th says: “Such finding and report of the court ■shall be taken to be merely advisory as to the law and facts found, and shall not conclude either the claimant or Congress."
In other words, Congress submitted these claims to the Court of Claims for its advice as to the law and the facts, but expressly reserved the right to follow or disregard the court’s advice as they might think proper. And that Congress declined to follow the advice of the court, to its full extent, is perfectly apparent.
The Court of Claims held, in substance, that the action of the United States in regard to these claims fell within the constitutional provision for taking private property for public use, and that Congress was bound, under this provision to pay to the claimants what was fairly due on their claims that had been sacrificed in the manner mentioned.
This would make the claim property in the hands of the original claimants, transferable and transmissible like other personal property of the nature of choses in action. If Congress had concurred in the finding of the Court, as to the law, it would follow that if any original claimant had been a bankrupt, his assignee would be the party entitled to receive the award. But, in appropriating for the pas^ment of awards, *268 Congress has expressly provided that in cases of bankruptcy the award should be made to the next of kin, instead of the bankrupt assignee, thus ignoring the incident of ownership which the Supreme Court had held to attach to valid claims which had bepn recognized by the government. Again, if these were valid claims as held by the Court of Claims, they would pass by a voluntary assignment by the claimant or by his will, and would be assets in the hands of his personal representatives for the payment of his debts. But Congress says that the award “shall not be paid until the Court of Claims shall certify to the Secretary of the Treasury that the personal representatives on whose behalf the award is made represent the next of kin. ’ ’ In other words, Congress says that the money shall not be paid to the executor or administrator for the benefit of creditors, or to assignees or legatees, but only the next of kin., which involves no recognition of legal property in the award, in the original-claimant.
Now, it is obvious that Congress has placed these claims on a very different footing from those which we have before spoken of, as to which it has been held that money appropriated generally for their payment takes the same course as the other estate of-the claimant. Congress has chosen to give this money a different direction. It may be plausibly said that there is no reason why Congress should prevent a claimant from bequeathing his claim to his own family, as was done in this case by a general bequest by Gardner of his estate. But if this might be done, he might also bequeath to a stranger, and if this right were conceded, it would be difficult not to concede all the other incidents of ownership, such as the right of assignment inter vivos, and the rights of creditors.
And Congress may well have thought that the only consistent course was to exclude all persons from participation in these awards except the immediate family of the deceased claimant, under the designation of “ the next of kin.”
It is not necessary, in this case, to determine whether the original claimants had a valid claim against the United States. It is sufficient, for the purpose of this case, that Congress, *269 while apparently recognizing the losses of the claimant as the ground of a morally meritorious claim,'has appropriated for it as if it were not a binding or legal claim, and as if the appropriation were more in the nature of a gratuity than of a satisfaction of a debt. It is entirely different-from the appropriation for the Alabama claims, which the Supreme Court said, in William vs. Heard, supra, was not a gratuity, and in which there was no attempt to control the distribution of the award.
It is somewhat like the case of an appropriation to the widow or children of a decedent on account of meritorious services rendered by the latter, which were yet not recognized as giving a legal claim.
It is not unlike, in principle, the legislation which gives to the administrator of a person whose death has been caused by the negligence of another, a right to recover damages for the injury, but confines the distribution of the damages recovered to the family of the deceased, instead of allowing them to go into his estate for the benefit of creditors.
Now, if Congress had not appropriated this money to the parties really entitled to it, all that follows is that their claims have not been satisfied by the appropriation and still remain unsettled. But this-is not money received for the use of these claimants. It is the money of the United States which Congress could appropriate as it thought. proper, and the Court have no right to divert the appropriation from the parties in whose favor it was made to others to whom we might think it ought to have been given. We can only determine to whom it was given. And we have no difficulty in reaching the conclusion that it was intended for the benefit of those who were next of kin to the deceased original claimant at the time the award was made. We are glad to find that we are anticipated in this conclusion by the Orphan’s Court in Philadelphia in a case to which our attention has been called. Clement’s Estate, The Legal Intelligencer, for November 20, 1891.
It follows that the fund in controversy in this case, being one-fourth of the award on the claim of Caleb Gardner, is to be distributed into three parts — one-third to each son’s descend *270 ants and one-third to those of Mrs. Clarke, their half-sister. Decree accordingly.
Plaintiff prayed a rehearing. His petition said the court holds that the claims known as the French Spoliation claims are not just claims against the government of the United States, and that the appropriation in this 'case and consequently of others made in the same act, ■ amounting in the aggregate to one million three hundred and four thousand and ninety-five dollars and thirty-seven cents ($i, 304,095.37) were gratuities or gif is to the next of kin of certain persons.
x. The case was insufficiently argued, and the point on which the decision turns barely referred to at all.
2. The proviso of the act on which the decision is based, relates solely to the regulation of the Treasury Department, and the Court of Claims in making payment of the sums appropriated and in no way relates to the distribution of such sums after they have left the Treasury.
The Court denied the application for rehearing December 21, 1891, speaking through Mr. Justice Cox, as follows:
An application has been made for a rehearing in this case. The object of the suit is to have the court determine how one of the awards of the French Spoliation claims should be distributed among the representatives of the original claimant, and the Court held that the act of Congress making the appropriation required it to be distributed among the next of kin. The application for a rehearing is made principally on the ground that the Court decided in this case that these were not just claims against the United States. This is a misconception of what the Court held. We did not undertake to decide that they were not just claims, but we simply held that the United States had carefully avoided recognizing them as legal claims against the United States, and have reserved the right to deal with them as they saw fit and undertook to distribute the money as they considered most equitable. Congress had a right to appropriate the money as they thought proper, and *271 they appropriated it without reference to the original justice of the claim. We are bound to say that under this act they gave it to the next of kin. We think that that is too plain for argument, and we accordingly adhere to the decision formerly made and overrule the application.