## STANDARD MARINE INS. CO., Limited, v. WESTCHESTER FIRE INS. CO.

District Court, S. D. New York.
Dec. 26, 1936.

On Rehearing April 30, 1937.

Cabell, Ignatius & Lown, of New York City (Hartwell Cabell and Charles L. Gleaves, both of New York City, of counsel), for plaintiff.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston, D. Roger Englar, Paul H. Lacques, and P. J. Kooiman, all of New York City, of counsel), for defendant.

Wendell P. Barker, of New York City (LeRoy B. Iserman, of New York City, of counsel), amicus curiæ.

KNOX, District Judge.

Throughout the period of the Great War, plaintiff, Standard Marine Insurance Company, Limited, a British corporation, and defendant's predecessor, United States Lloyds, an American corporation (hereinafter called the defendant), were largely engaged in the business of insuring marine and war risks. Owing to the hazardous nature of the business, it was desirable that one company should not alone carry the entire liabilities for the risks covered by its policies. Thus it was that on numerous occasions, the parties became mutually interested in the same risks. In some instances in which the defendant had become a direct underwriter or reinsurer, it ceded to plaintiff by way of reinsurance or retrocession, respectively, a proportionate part of the liability that had been assumed. In such cases plaintiff obligated itself to pay a specified proportion of any loss defendant might suffer pursuant to its contracts of insurance or reinsurance respectively. Similarly, there were instances in which plaintiff had become a direct underwriter or a reinsurer, and ceded to defendant by way of reinsurance or retrocession, respectively, a proportionate part of its burden. Thereupon, defendant became obligated to cover a specified proportion of any loss the plaintiff might sustain. In still further instances, the plaintiff became an insurer or reinsurer concurrently with, or in conjunction with, defendant. Under such arrangements plaintiff and defendant became coinsurers, and obligated themselves to bear the burden of any losses in proportions determined by the provisions of the contracts.

The war and its attendant circumstances inflicted losses, both of life and property, on the nationals of many countries, neutral and combatant. Those losses which the parties herein had insured were

paid, and each party fully discharged the obligations it had assumed toward the other. Upon the termination of the war, an attempt was made to require the vanquished nations to pay the losses that were properly chargeable to their hostile activities To effectuate this plan, the neutral countries, e. g., Holland, Sweden, Norway, negotiated separate treaties with Germany. The Allied nations, with the exception of the United States, became parties to the Treaty of Versailles, under which they were entitled to claim reparation for all damages suffered by their nationals.

Officially, the war between the United States and Germany did not end until July 2, 1921, when its cessation was declared in a Joint Resolution adopted by the American Congress (42 Stat. 105). This resolution specified that the Treaty of Peace to be negotiated between the two countries should provide that all property of the Imperial German Government, or of its successor, and of all German nationals under the control of the United States, should be retained until Germany should make suitable provision for the satisfaction of claims of persons who owed permanent allegiance to the United States, and who had suffered loss or damage through the acts of the Imperial German Government subsequent to July 31, 1914.

The treaty contemplated by the Joint Resolution was signed at Berlin on August 25, 1921, and was proclaimed by the President of the United States on the 14th of the following November. Under the treaty provision, Germany undertook to accord to the United States, all the rights, privileges, indemnities, and reparations specified in the Joint Resolution of July 2, 1921. In August of the following year, an executive agreement between the two governments was consummated. Pursuant to its terms, a tribunal known as the Mixed Claims Commission was established, being composed of one commissioner from each country, and an umpire chosen by the commissioners. This commission was authorized to adjudicate such claims of American citizens against the German Government as might be asserted, a procedure for settling claims similar to that adopted between Germany and the other Allies. The nationals of each country who claimed a right to reimbursement for losses sustained were relegated to the tribunal which their respective governments had set up for the determination of such claims, e. g.,

the Anglo-German Mixed Arbitral Tribunal, the Franco-German Mixed Arbitral Tribunal, etc.

In due course, defendant filed with the Commission Memorials of its claims against Germany, amounting in the aggregate to $2,173,601.66. These Memorials represented the full amount that had been paid by defendant upon account of losses, without deducting therefrom any sums that had been received from plaintiff as reinsurer. They did not include, however, any sums paid by defendant to plaintiff under contracts in which the defendant was the reinsurer. After argument before the Commission in July, 1923, the agent of the United States required defendant to disclose all amounts received from foreign reinsurers, and also all amounts paid by defendant as reinsurer to foreign insurance companies. This disclosure apparently was predicated upon an agreed statement by the American and the German agent, adopted June 23, 1924, as to the character of the claims to be presented.

Inter alia, the statement set forth that: "* * * no underwriters, other than corporations incorporated under the laws of the United States or any State thereof * * *, and partnerships and/or individuals other than such as owe permanent allegiance to the United States, are to share in any manner whatsoever in the distribution of the awards involved in this settlement." Upon the basis of the Memorials and this additional data, the Commission, on September 18, 1924, decreed that, under the terms of the treaty the Government of Germany was obligated to pay to the Government of the United States on behalf of the defendant the sum of $1,-396,881.41, with interest. The amount of the award was calculated by taking 83 per cent. of all sums paid by defendant on account of contracts of marine and war risk insurance which had been reinsured by the plaintiff, and deducting therefrom all sums received from foreign reinsurers. To the resulting figure was added 83 per cent. of all sums defendant had paid plaintiff on risks in which the former was reinsurer, and also 83 per cent. of sums paid by defendant to plaintiff on contracts in which the parties were co-insurers. By reason of the award, the defendant has thus far received payments of substantial amounts.

In the meanwhile, on August 10, 1922, plaintiff, in company with other foreign underwriters, presented to the Commission

a Memorial claiming $550,000. The claims were dismissed by the Commission on the ground that, under the Treaty of Berlin, the United States was not entitled to claim reparations on behalf of non-American corporations. The British Government proceeded to press the claims of its own nationals before the Anglo-German Mixed Arbitral Tribunal and has received from the German Government various awards based on the claims thus asserted. Unlike the United States, the British Government has adopted a policy of discretionary distribution of sums awarded to it, turning over portions of such recovery only to such of its nationals who are "necessitous." Under such circumstances, the plaintiff has been the recipient of none of the awards recovered by its sovereign upon behalf of plaintiff's losses.

Being thus deprived of any recoupment by reason of the procedures that have been outlined, plaintiff has brought this action in equity for an accounting, and for the recovery of the amount, to be determined by a special master, by which it claims defendant has been unjustly enriched at plaintiff's expense.

The theory on which suit is based is somewhat as follows:

The decision of the Mixed Claims Commission that only Americans are to share in any manner whatsoever in the distribution of the awards was not intended to deny to the plaintiff any derivative right it may have to the award, or if so intended the restriction thus imposed was beyond the power of the Commission. The contention is advanced that the award made in favor of defendant is to be regarded as salvage in diminution of losses sustained rather than a gift or gratuity made by the United States in recognition of injuries sustained by one of its nationals through the depredations of a public enemy. Therefore, it is claimed, the award should be distributed between the underwriters in proportion to their respective contributions to losses paid upon the policies, and according to rules of insurance usually applicable in such cases. The plaintiff claims that: . (1) As to the amounts received by defendant as insurer, in respect to contracts which the plaintiff reinsured, the defendant has been unjustly enriched by the amounts by which the sums paid by the plaintiff, as its share of the losses, exceed the plaintiff's share of the losses as ultimately adjusted by deduct-

ing from the total amount of said losses the amount of the award of the American Commission; (2) as to the amounts received by the defendant in respect to contracts which the defendant reinsured, or to which the plaintiff and the defendant were co-insurers, the defendant has been unjustly enriched by an amount equal to the difference between the defendant's payment, minus the amount of the award and the defendant's share of the losses as ultimately adjusted.

The defendant contends that, under the Treaty of Berlin, only Americans are entitled to redress against Germany; and since the sole claim allowed by the Mixed Claims Commission was for the out-of-pocket losses of the defendant, the sum it has received did not come into its hands as subrogee of the persons assured. Hence, the award does not constitute salvage in which the plaintiff is entitled to share.

Upon the argument, the scope of the duty of co-insurers in respect to salvage was not stressed. The discussion was mainly directed to the situation where the defendant is the insurer and the plaintiff the re-insurer. However, the decision to be reached will also go to the question as to whether the plaintiff, in any of its relationships with defendant, is rightfully entitled to a share of defendant's award. If the declaration of the Mixed Claims Commission that only Americans should share in the distribution of awards forecloses plaintiff's rights to relief, the particular insurance relationship is immaterial.

The question of the jurisdiction of international arbitral commissions is not novel. Probably the earliest case to find a place in American jurisprudence is Comegys v. Vasse, 1 Pet. 193, 7 L.Ed. 108. There, an underwriter, named Vasse, had insured and paid the losses on various American vessels and cargoes which had been captured by Spaniards. Thereafter, Vasse became insolvent, made an assignment under the Bankruptcy Act of 1800 (2 Stat. 19), and was discharged. In 1819, a treaty was concluded between the United States and Spain under which Florida was ceded to the United States, and Spain was formally released from its obligation to American citizens. The United States agreed to appropriate $5,000,000 to take care of those whose property had been injured or destroyed by the Spaniards. To

ascertain the amount and validity of the claims a commission of three men was to be appointed to " * * * receive, examine and decide upon the amount and validity of all claims." See Comegys v. Vasse, supra, 1 Pet. 193, 211, 7 L.Ed. 108. In 1824, the commissioners awarded the assignees the sum of $8,846.14 on account of Vasse's losses. Vasse sued the assignees to recover the award and the first question argued in the case was: "1. Whether the award of the commissioners, under the treaty with Spain, directing the money to be paid to the defendants, as assignees of Vasse (which is assumed to be the true state of the fact), is conclusive upon the rights of Vasse; so as to prevent his recovery in the present action?"

The answer given by Mr. Justice Story was as follows: "The object of the treaty was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of the asserted claims upon Spain for damages and injuries. Their decision, within the scope of this authority, is conclusive and final. If they pronounce the claim valid or invalid, if they ascertain the amount, their award in the premises is not re-examinable. The parties must abide by it, as. the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review, in any judicial tribunal; an amount once fixed, is a final ascertainment of the damages or injury. This is the obvious purport of the language of the treaty. But it does not necessarily or naturally follow, that this authority, so delegated, includes the authority to adjust all conflicting rights of different citizens to the fund so awarded. * * * The validity and amount of the claim being once ascertained by their award, the fund might well be permitted to pass into the hands of any claimant; and his own rights, as well as those of all others, who asserted a title to the fund, be left to the ordinary course of judicial proceedings in the established courts, where redress could be administered according to the nature and extent of the rights and equities of all the parties. We are, therefore, of opinion, that the award of the commissioners, in whatever form made, presents no bar to the action, if the plaintiff is entitled to the money awarded by the commissioners."

This statement of Justice Story has often been cited and approved, see Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550, and was closely relevant to the disposition of the case. If the decision of the Florida commission were conclusive against Vasse, the Supreme Court would not have gone into the merits of his claim. However, it proceeded to do so.

What claims can be considered by the Commission and how the award should be distributed among claimants before the Commission are questions to be distinguished from that of the distribution of an award after it has been paid. Such distinction has been recognized by the Mixed Claims Commission. In Administrative Decision. No. 2 the Commission in passing upon the contention that it could make only lump sum awards, and that it was not authorized to distribute them between claimants and persons having derivative rights, said: "The suggestion that under the rule announced by these authorities this Commission is without jurisdiction to apportion its awards amongst several joined as claimants in one case is due to a misapprehension of the exact point decided. These authorities deal not with the original claimants' primary right to recover but with conflicts over asserted rights to receive payment arising (1) between the original claimants and those claiming under them or (2) between two or more whose rights are derivative, not original, claiming through assignments or transfers, voluntary or involuntary, from the original claimants. All of the authorities cited in effect recognize the exclusive and final power of international arbitral tribunals to determine in whom a cause of action originally vests, as well as to determine all other questions involving its validity and the amount recoverable. They hold that these are issues to be decided by the international tribunal according to the law of nations, but that all questions involving the transfer of interest from and through the original owner must be decided by municipal tribunals according to local jurisprudence."

This clear statement of what the Commission deemed to be the scope of its powers must be used to elaborate the declaration that only Americans "are to share in any manner whatsoever in the distribution of the awards involved in the settlement." See, also, Mixed Claims Commission, Adm.Dec. (October 1, 1926, to December 31, 1932) p. 912. I am constrained

to conclude that the Commission could not control, even though it so intended (which I think was not the fact), the ultimate distribution of the award after the money passed into the hands of the awardant. Comegys v. Vasse, supra; Williams v. Heard, supra; see also Butler v. Goreley, 146 U.S. 303, 309, 13 S.Ct. 84, 36 L.Ed. 981; Robertson v. Gordon, 226 U.S. 311, 317, 33 S.Ct. 105, 57 L.Ed. 236.

The next issue is whether the award constitutes salvage in which, under the law of insurance, the plaintiff is entitled to share. It is settled in this country that an award by an arbitral commission for losses arising from the depredations of a foreign government is not a gift from the United States but, rather, the satisfaction of a right against the foreign government. Comegys v. Vasse, 1 Pet. 193, 7 L.Ed. 108; Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550. Undoubtedly the award of the Mixed Claims Commission is compensation for loss of property, and not a gratuity. Marine Transport Company v. Commissioner of Internal Revenue (C.C.A.) 77 F.(2d) 177. But, is the compensation of such nature that plaintiff is entitled to participation therein?

In my opinion, there is no inexorable logical sequence from a finding that an award is not a gift to a conclusion that it must be salvage in which a reinsurer may share. In Burnand v. Rodocanachi, 7 A.C. 333, the plaintiffs had insured a cargo which was destroyed by the Alabama. The real value of the cargo exceeded the amount paid by the insurer. After the settlement of the Alabama claim with England, under which that country paid the United States a lump sum, Congress provided for the distribution of the fund through the payment to cargo owners of the difference between their real total loss and the amount received from underwriters. The insurers sued the cargo owner, claiming that the award by Congress was salvage to which they were entitled by way of subrogation. Recovery was denied. The language of Bramwell, J., and of the members of the House of Lords convinces me that the basis of the judgment in that case was the intention of Congress to compensate only the cargo owners, and not to reduce the losses of insurance companies. See, also, Castellain v. Preston, 11 Q.B.D. 377, 404. The plaintiff concedes that its interpretation of Burnand v. Rodocanachi fails to reconcile that case with Randal v. Cochran, 1 Ves.Jr. 98, and Blaauwpot v. Da Costa, 1 Eden 130, in both of which it seems that the award was by grace of the sovereign, and yet the insurer was permitted to share. See, also, Stearns v. Village, 10 Com.Cas. 89, 21 T.L.R. 236; Arnould, Marine Insurance (11th Ed.) §§ 1234-1236. The English law appears clearly to indicate that the sovereign has power to determine who may share in an award, such as was made in satisfaction of the Alabama claim. Whether or not the award be regarded as a "gift" is immaterial. By a parity of reasoning, it would seem that whether or not the award is satisfaction of a right for which the sovereign provided the remedy is not controlling. In prosecuting the claim and in permitting its citizens to reap the benefit of such prosecution, the sovereign can make its own terms, whether said award be termed a "gift" or remedy for a pre-existing right.

In this country there are no cases as close to the question in issue as Burnand v. Rodocanachi, supra. The plaintiff relies upon Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550. That case concerned a point specifically covered by the Bankruptcy Act. There, as here, the award against the foreign government was recognized as satisfaction of a right for which the United States government provided a remedy. However, the proposition that rights pass to a bankrupt's assignee in accordance with statutory provision does not lead to the conclusion that an insurer must necessarily share in the distribution of such recovery. There is no rejection in Williams v. Heard, supra, of Burnand v. Rodocanachi, supra, and the cases are consistent on their facts.

The manner of calculation followed by the Mixed Claims Commission indicates clearly that recovery of defendant herein was based upon actual out-of-pocket losses, similar to the awards considered in Burnand v. Rodocanachi, supra. The method of settlement of claims arising out of the World War gave to each country the privilege and power of asserting the claims for damages to its own citizens. The purpose was not only orderly administration but also equitable distribution. Each nation was to recover in proportion to the losses of its citizens, and every injured person was dependent upon his own sovereign for consideration. Hence, the

**340**

money which defendant has received came to it merely as a part of the plan of settlement pursuant to which each nation collected from Germany the war losses of its own citizens. England asserted and collected the claim of plaintiffs herein. The United States asserted and collected the claim of defendants herein. England did not choose to distribute to the plaintiffs the funds collected on their behalf. The United States did make such a distribution.

So far as I can see this difference in treatment of plaintiff and defendant by their respective governments gives rise to no equity in the nature of subrogation or otherwise, whereby plaintiff is entitled to share in a fund which, by the intervention of the United States, defendant has been permitted to receive. Plaintiff's complaint should more reasonably be directed to the course of procedure adopted by its sovereign. If defendant were required to share its recovery with plaintiff, the result would be that at defendant's expense, plaintiff and the British Government together would have a larger sum than was rightfully payable to Great Britain by Germany upon account of losses suffered by plaintiff. This certainly was not intended by the broad plan of settlement of war claims against Germany, nor by the signatories to the treaty of Berlin. The intention was to the contrary and is controlling.

The complaint is dismissed.

### On Rehearing.

Following my opinion, heretofore filed herein, plaintiff requested a further hearing at which facts not already in the record could be presented, and on the basis thereof, the whole case reargued. The rehearing was granted. Upon consideration of the new evidence, I have concluded that it elaborates rather than conflicts with the facts recited in my original opinion.

The only new evidence is to the effect that the British Government did not include in its schedules of reparations any claim on behalf of British insurance companies. Such evidence has little weight in the light of the fact that the reparations program was a world-wide plan in which many nations participated, each presenting the claim of, and getting the best settlement it could for, its own nationals. See, generally, 37 Columbia Law Review, 659. Great Britain's demands for reparations aggregated more than £2,500,000,000, of which £763,000,000 represented shipping losses. Even if that figure does not include payments by insurance companies, such fact is not a ground for shifting the losses resulting from such absence to American nationals. Moreover, it seems reasonably certain that the position of plaintiffs as respects reparations collected by the British Government would have been no better if claims on behalf of insurance payments had been included in the reparations budget. The policy of the British Government, so different from that of our own, would undoubtedly have excluded the plaintiffs from any remuneration. This is clearly reflected in the proclamation setting up the Royal Commission on Compensation for Suffering and Damage by Enemy Action, and in the reports of that Commission, placed in evidence by plaintiff.

Plaintiff has also asked permission to submit proof that defendant's war risk business gave it a net profit. Such evidence is relevant only to questions of whether defendant was entitled to any award and, if so, the manner of its calculation. Those matters were solely within the jurisdiction of the Mixed Claims Commission, and are not germane to the present controversy.