WILLIAM A. LEFFINGWELL AND OTHERS' APPEAL FROM PROBATE.

SARAH B. LEFFINGWELL AND OTHERS' APPEAL FROM PROBATE.

AUGUSTUS R. S. FOOTE AND ANOTHER'S APPEAL FROM PROBATE.

ELLIOTT H. MORSE'S APPEAL FROM PROBATE.

New Haven & Fairfield Cos., June T., 1892. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

Appropriations by act of Congress of March 3d, 1891, for the payment of claims for losses by what are known as the "French Spoliations," upon a finding and report of the Court of Claims in each case under the act of 1885, go (with a certain express exception) to the estates of the original sufferers by the losses, and not to those who were next of kin at the date of the act.

[Argued June 8th—decided November 21st, 1892.]

APPEALS from a decree of the probate court of the district of New Haven, ordering the distribution of $74,864.46,

among the residuary legatees of William Leffingwell, deceased; taken to the Superior Court in New Haven County. The amount ordered distributed was the balance of $76,064.45 in the hands of Oliver S. White, administrator *de bonis non*, with the will annexed, of the said William Leffingwell, upon the settlement of his administration account in the probate court. This $76,064.45 was half of the sum of $160,478.29 received from the United States government by the executor and on his death held by the administrator *de bonis non*, with the will annexed, of Hezekiah B. Pierrepont, surviving partner of the firm of Leffingwell & Pierrepont, for losses sustained by the firm by the seizure by a French privateer in January, 1797, and subsequent condemnation and sale by a French prize court, of a vessel and cargo belonging to the firm. A claim for the loss was under the act of Congress of January 20th, 1885, presented to the Court of Claims by the executor of said Pierrepont and the above sum of $160,478.29 was found by the court to be justly due to the claimant, and that amount was appropriated to the payment of the claim by act of Congress of March 3d, 1891. The $74,864.46 was half of that sum left in the hands of the administrators of the Pierrepont estate, upon settlement of their administration account in a surrogate court of the state of New York.

William Leffingwell died in 1834, leaving a will, in which he gave the residue of his estate to sundry legatees named, and the probate decree ordered the distribution of the $74,864.46 to these residuary legatees. The appellants claimed to be entitled to the money as his next of kin at the time of the passage of the act of March 3d, 1891.

The appeals were heard together in the Superior Court, a single finding of facts made, and the cases reserved for the advice of this court. Other facts are stated in the opinion.

*H. Stoddard* and *J. W. Bristol*, with whom was *L. H. Bristol*, for the appellants in William A. Leffingwell's and Sarah B. Leffingwell's appeals, and for the appellees in Elliott H. Morse's appeal.

1. The question is, whether the fund of $74,864.46, remaining in the hands of Mr. White as administrator, is to be deemed a portion of William Leffingwell's estate and subject to the provisions of his will, or whether it is a special fund, of such an origin and character that the court must order it to be distributed among those who were his next of kin on the 3d of March, 1891. The latter is the appellants' contention. It may be premised that *primâ facie* the fund cannot form part of Leffingwell's "estate," because it had no existence until the passage of the act of 1891; and the fact that Congress directed the money to be paid over to his administrator does not, of itself, make it part of his "estate," but only indicates that the administrator was selected to administer the fund *in accordance with the trust inherent in it by its own nature, or which, by the terms of the act, was specifically impressed upon it.*

2. The true nature of the fund is shown by the manner in which it originated. The claim is one of a class known as French Spoliation Claims, growing out of depredations on our commerce by the French prior to 1800. Upon a claim made upon France by our government for redress, a counter-claim was made by France for a breach of the treaty alliance of 1778. By the treaty of 1800 the two countries mutually renounced their antagonistic claims. The United States did not receive any money to be applied to the relief of its citizens who had suffered the grievances, as in the case of the Alabama claims, and did not stipulate, as in the treaty with Spain, to assume and pay the claims of its citizens, but merely abandoned its claims as a nation against France, in consideration of the abandonment by France of its claim against the United States. The original sufferers thereupon asserted that this action of our government was an appropriation of their property to the public use, and insisted upon being compensated therefor. After nearly ninety years of discussion, Congress passed the French Spoliation Act of January 20th, 1885. That act provides:—(1.) That such of our citizens as had claims to indemnity arising out of such illegal captures prior to the

treaty of 1800, might apply by petition to the Court of Claims.—(2.) That this court should examine and determine the validity and amount of all such claims and report to Congress such conclusions of fact and law as in their judgment might affect the liability of the United States therefor.—(3.) That the court should report to Congress for final action the facts found by it and its conclusions, such findings and conclusions to be merely advisory.—(4.) And finally that nothing in the act should be construed as committing the United States to the payment of such claims. The consideration of these facts and of the provisions of the act of 1885 makes it clear that whatever claim to compensation any claimant had, its source is not to be found in any action of the Court of Claims. Whatever title there is comes from some other source. "The rights of the claimants, if any exist, arise from the acts of the political branch of the government done in protection and aid of the nation. *For such rights there can be no remedy other than that granted by the legislature.*" *Gray, Admr.*, v. *U. States*, 21 Court of Claims Rep., 344. *The action of the court being purely advisory, Congress necessarily reserved to itself, as the ultimate tribunal, the decision of what relief, if any, it would afford to such claimants as it might select, upon such terms and conditions as it might see fit to impose.* This is a fact of controlling significance, and distinguishes the present case from cases like *Comegys* v. *Vasse*, 1 Peters, 193; *Phelps* v. *McDonald*, 99 U. S. R., 298; *Erwin* v. *U. States*, 97 U. S. R., 392; *Leonard* v. *Nye*, 125 Mass., 455. In cases like *Comegys* v. *Vasse*, Congress says, in substance, —"establish your right as an original sufferer and we will pay the claim;" on the theory that the claimant had had from the time of the loss a valid claim against the government whose acts had caused it. But here Congress says—"Establish the fact that you or your decedent was an original sufferer, and we will then determine what we will do about it;" in which case the fund owes its origin, not to any right on the part of the original sufferers, but solely to the act of Congress itself. The case is not distin-

guishable in principle from *Heirs of Emerson* v. *Hall*, 13 Peters, 409. Congress had passed an act for the relief of certain parties who had as custom house officers rendered important services in the seizure of a brig engaged in the slave trade, but for which the Supreme Court had held there was no legal obligation on the part of the United States to compensate them out of the proceeds of the seizure and sale. The court says:—"A claim having no foundation in law, but depending entirely on the generosity of the government, constitutes no basis for the action of any legal principle. * * * And if the government shall think proper to make a grant of money to the heirs of the claimant, they receive it as a gift of pure donation,—a donation made, it is true, in reference to some meritorious act of their ancestor, but which did not constitute a matter of right against the government. * * * Not one of these claims is enforceable but by the consent of Congress, and *Congress can affix to that consent such conditions as in their wisdom seem just and for the best interest of the republic.*" *Gray, Admr.,* v. *U. States, supra.*

3. What then has been the action of Congress in this matter? Having before it the advisory report of the Court of Claims, it proceeded to pass the act of March 3d, 1891. That act appropriates money "to pay the findings of the Court of Claims, for indemnity for spoliations by the French prior to July 31st, 1801, namely: * * * On the ship 'Confederacy,' Henry E. Pierrepont, executor of the will of Hezekiah B. Pierrepont, the last surviving partner (deceased) of the firm of Leffingwell & Pierrepont, $160,478.29, *provided that in all cases where the original sufferers, were adjudicated bankrupts the award shall be made on behalf of the next of kin instead of assignees in bankruptcy, and the awards in the cases of individual claims shall not be paid until the Court of Claims shall certify to the secretary of the treasury that the personal representatives on whose behalf the award is made represent the next of kin, and the courts which granted the administrations respectively shall have certified that the legal representatives have given adequate security for the legal*

*disbursement of the awards.*" Our opponents rest their case
upon the theory that this act converted the *ethical right* of
the claimants into a *property right*, relating back to the time
of the injury. Before considering its language, three facts
are to be noted:—(1.) If Congress, by its action in thus
appropriating money converted the claim into a right of
property, it necessarily follows that it became and was *prop-
erty existent from* 1800, and as such property *it was beyond
the competency of Congress to regulate its distribution, as it
confessedly did in the case of bankrupt estates.* The only
theory on which this can be justified is, that the action of
Congress was in the nature of a gratuity, induced indeed
by a consideration of ethical rights, but giving no other
property rights than such as grew out of that action and
dated from the time it was had.—(2.) It is a most significant
fact that, although the Court of Claims found and reported
to Congress that the New York Insurance Company was
*subrogated to the rights of Leffingwell & Pierrepont* to the ex-
tent of $12,000 paid by them *as insurers upon this identical
ship,* and that such insurers were entitled to collect that
amount from the United States, (*Gray, Admr.,* v. *U. States,
supra,*) yet Congress refused to appropriate a dollar for
that purpose. The two claims were, in fact, one and indi-
visible, alike in law and morals, and if Congress by its ac-
tion intended to recognize an *obligation* on the part of
the government, why did it appropriate money to pay one
part and refuse to pay the other part of the same claim?
Evidently because it was dealing with the matter as one
not of right but of favor, and therefore, as in the case of
other gratuities, limited its bounty to the class which it saw
fit to select.—(3.) Certain incidents and conditions, as will
be hereafter seen, were affixed to the appropriation, which
are utterly inconsistent with the idea that Congress intended
to recognize an existent right of property. But a fair
construction of the language used must of itself exclude
all persons, both creditors and legatees, except the next of
kin. By the act an appropriation is made to the personal
representatives of a deceased claimant in trust, of course,

for such persons as are represented by them; and those per-
sons are, primarily and strictly speaking, the next of kin,
and no one else. The question is not, for whom would the
administrator hold it if it were paid to him as a portion of
the decedent's *estate*,—as if, for instance, the appropriation
had been made "to the *estate* of William Leffingwell," for
it was not so made, and advisedly, because it was intended
that he should take it not as an administrator in behalf of
the estate, but as a trustee for those whom he personally
represented, in order to exclude all other possible claimants.
And it is also to be borne in mind that the fund, coming into
existence as property only upon action had by Congress half
a century after the testator's death, it cannot possibly form
a part of his *estate* on which the will can operate, so as to
give any legatee a right to share in its distribution. But
we are not left to speculation as to the real intent of Con-
gress as regards the distribution of this fund. The first
clause of the proviso is, "that in all cases where the origi-
nal sufferers were adjudicated bankrupts, the award shall be
made on behalf of the next of kin," so that by the express
terms of the act, in case bankruptcy had supervened, the
assignee who succeeded to the rights of the original sufferer
was barred, and the next of kin substituted in his place.
It is in the light of this clear intention that we are to con-
strue the next clause of the proviso:—"And the awards in
the cases of individual claimants shall not be paid until the
Court of Claims shall certify to the secretary of the treas-
ury that the personal representatives on whose behalf the
award is made represent the next of kin." What possible
meaning can this language have except to limit the payment
to the next of kin? Why, if the award was to form part
of the corpus of the "estate," should the court be called
on to make any certificate? Any other construction con-
travenes the plain intent of the act. It specifically excludes
creditors in the case of bankruptcy, and it is impossible to
suppose that it did not also intend to exclude creditors in
the case of insolvent estates as well, and yet they can only
be excluded by giving the language the construction for

which we contend. The legatee can stand in no better position than the creditor. He is a mere volunteer.

4. The preceding view of the scope and intent of the act of Congress is confirmed by a consideration of the special legislation had in this state in reference to these claims. The act of Congress was passed on the 20th of January, 1885, and thereupon, on the 10th of March following, the legislature of Connecticut passed an act providing as follows:—" Whenever it shall appear that any resident of this state had at the time of his death any claim against the United States government, of the class commonly known as the French Spoliation Claims, the court of probate which now has jurisdiction over the district where such person resided at the time of his death, shall, on application of any person claiming to be interested in such claim, appoint an administrator upon the estate of said original claimant, whether administration has been heretofore granted thereon or not, *to the end and purpose only of taking all proper and reasonable measures to prosecute and collect such claim and dispose of the proceeds thereof according to law.*" If the fund when received was to form part and parcel of the corpus of the " estate," it was absurd to require the appointment of a new and special administration for the sole purpose of administering it. The act of 1886 emphasizes the correctness of this position, for by it the probate court is empowered to grant a special administration, " *whether there be an administrator or administrators now living*, and capable of acting, to whom administration has been granted thereon, or not, *without requiring the resignation of such administrator or administrators who may be living;* " thereby emphasizing the fact that the new administration was to be for a special purpose, collateral to and outside of the " estate," which' was to be administered by the original administrator.

5. The following authorities sustain our view of the case : *Clement's Estate,* 10 Penn. County Ct. Reps., 481 ; *Gardner* v. *Clarke,* 20 Wash. Law Reporter, 2 ; *Carey, Admr.* v. *Morris,* (Circuit Court of Maryland, not yet published;) *Heirs of Emerson* v. *Hall,* 13 Peters, 409 ; *Gillan* v. *Gillan,*

55 Penn. St., 430 ; *Brooks* v. *Ahrens*, 68 Md., 212 ; *Taft* v. *Marsily*, 120 N. York, 474 ; *Kingsbury* v. *Mattocks*, 81 Maine, 310 ; *Head* v. *Sturgis*, 146 Mass., 545. It is true that this last case has been overruled by the Supreme Court of the United States, (140 U. S. R., 529,) but only upon the ground that the provision made by the act of 1882, for the payment of insurance premiums, was not a gratuity or donation. It is instructive to read the language of the court in this connection, as supporting the contention which we have made in the present case.

*S. E Baldwin*, and *W. Trumbull*, for the appellants in Augustus R. S. Foote's appeal, and for the appellees in Elliott H. Morse's appeal.

*J. W. Alling* and *J. H. Webb*, for the appellants in Elliott H. Morse's appeal, and for the appellees in the appeals of William A. Leffingwell, Sarah B. Leffingwell, and Augustus R. S. Foote.

ANDREWS, C. J. Each of these appeals was taken from an order of the probate court for the district of New Haven made on the 9th day of March, 1892. They were argued together and depend on the same reasoning.

The order was as follows :—" District of New Haven, ss. Probate Court, March 9th, 1892. Estate of William Leffingwell, late of New Haven in said district, deceased. Upon the settlement of the administration account of said estate there remains for distribution in the hands of the administrator the sum of 74,864 dollars and 46 cents in residuary personal estate ; and there being the following residuary legatees under the will of the said deceased, or their representatives, namely, the children of William Leffingwell, a son of said deceased ; Caroline Street, a daughter of said deceased ; Maria Williams, a daughter of said deceased ; the children of Lucius Leffingwell, a son of said deceased ; and William A. Beckley, trustee under said will for Edward H. Leffingwell, a son of said deceased, said Beck-

ley being the successor to Henry White, who was the last survivor of Roger S. Baldwin, Samuel J. Hitchcock and Henry White, trustees under said will for said Edward H. Leffingwell:—Therefore, ordered—that the estate be distributed by said administrator among the said residuary legatees, according to law and said will, as follows:—one fifth thereof to the children of William Leffingwell, a son of said deceased, or their executors or administrators; one fifth to the executors or administrators of Caroline Street, a daughter of said deceased; one fifth thereof to the executors or administrators of Maria Williams, a daughter of said deceased: one fifth thereof to the children of Lucius Leffingwell, a son of said deceased, or their executors or administrators; one fifth thereof to said William A. Beckley, trustee under said will for Edward H. Leffingwell; and make return to this court."

In each of the first three cases there is one reason of appeal in common, namely, "that the sum of $74,846.46, balance of the fund received by said Oliver S. White, administrator, was received by him in behalf of and as representing the next of kin of said William Leffingwell, and was not received by him as part of the estate of the said William Leffingwell, or as assets thereof."

If this reason of appeal should be held to be untrue then there is no error in the decree of the probate court and the same should be affirmed; otherwise there is error. The Superior Court made a finding of facts and reserved all the cases, as though they were parts of one case, for the advice of this court.

From this finding it appears that William Leffingwell, late of New Haven, died in 1834, leaving a will, the parts of which material to the present inquiry are as follows:—

" The rest and residue of my estate I divide into five equal portions, one of which I give and devise to the children of my deceased son William; one to my daughter Caroline; one to my daughter Maria; one to the children of my son Lucius; and one to Roger Sherman Baldwin, Samuel J. Hitchcock and Henry White, and to the survivor

and survivors of them, in trust for my son Edward. And I do appoint the said Roger Sherman Baldwin, Samuel J. Hitchcock and Henry White, Esqs., and the survivor and survivors of them, joint executors of this my last will and testament, hereby revoking all former wills."

The executors entered upon said trust and settled the estate, which was solvent, and, after paying all debts, delivered and transferred, on the 10th day of September, 1835, under the residuary clause, to the legatees therein named, about $10,000. Henry White, the last survivor of said executors and trustees, died prior to 1880. On the 28th day of October, 1880, William A. Beckley was appointed by the court of probate in New Haven his successor as trustee. He accepted that duty and gave bonds for the faithful performance thereof. And on the 11th day of January, 1887, the court of probate appointed Oliver S. White administrator *de bonis non* with the will annexed, on the estate of the said William Leffingwell, " for the sole purpose and end of taking all proper and reasonable measures to prosecute and collect certain claims against the United States government commonly known as the French Spoliation Claims, and also to render an account of his administration when ordered by this court." And he was ordained, deputed and constituted administrator *de bonis non* with the will annexed, of all and singular the goods, chattels, credits and estate aforesaid.

The administrator received from the United States government, under circumstances hereafter to be stated, the sum of 76,064 dollars and 45 cents, of which he rendered his account to the court of probate; and upon the settlement of his account by the court the order was made above recited, from which these appeals were taken.

In his lifetime William Leffingwell had been a member of the firm of Leffingwell & Pierrepont, composed of himself and Hezekiah B. Pierrepont, each owning an equal share in the partnership. The firm owned a ship named " Confederacy " and its cargo. That ship was captured by the French in June, 1797, taken into Nantes, and there condemned and sold.

In 1885 Congress passed an act, (23 Statutes at Large, 283,) entitled an act to provide for the ascertainment of claims of American citizens for spoliations committed by the French prior to the 31st day of July, 1801, which provided as follows:—

"Sec. 1. That such citizens of the United States, or their legal representatives, as had valid claims to indemnity upon the French government arising out of illegal captures, detentions, seizures, condemnations and confiscations, prior to the ratification of the convention between the United States and the French Republic concluded on the thirtieth day of September, 1800, the ratifications of which were exchanged on the 31st day of July following, may apply by petition to the Court of Claims within two years from the passage of this act as hereinafter provided," etc. etc.

"Sec. 3. That the court shall examine and determine the validity and amount of all the claims included in the description above mentioned, together with their present ownership, and if by assignee, the date of the assignment, with the consideration paid therefor; provided," etc., etc.

"Sec. 6. That on the first Monday of December in each year the court shall report to Congress for final action the facts found by it, and its conclusions in all cases which it has disposed of and not previously reported. Such finding and report of the court shall be taken to be merely advisory as to the law and facts found and shall not conclude either the claimant or Congress; and all claims not finally presented to said court within the period of two years limited by this act, shall be forever barred; and nothing in the act shall be construed as committing the United States to the payment of any such claims."

After the passage of the act Henry B. Pierrepont, the executor of Hezekiah B. Pierrepont, the last surviving partner of said firm of Leffingwell & Pierrepont, made application to the Court of Claims for an allowance on account of the capture and sale of said ship "Confederacy;" and such proceedings were had before that court upon such application that the court reported to Congress certain con-

clusions of fact in reference to the matters contained in said application, and certain conclusions of law thereon as follows :—

"The court decides as conclusions of law that the said seizure and condemnation were illegal, and the owner and insurers had valid claims of indemnity therefor upon the French government prior to the ratification of the convention between the United States and the French republic, concluded on the 30th day of September, 1800; that said claims were relinquished to France by the government of the United States by said treaty in part consideration of the relinquishment of certain national claims of France against the United States; and that the claimants are entitled to the following sums from the United States:—"Henry E. Pierrepont, executor of the will of Hezekiah B. Pierrepont, the last surviving partner (deceased) of the firm of Leffingwell & Pierrepont, one hundred and sixty thousand four hundred and seventy-eight dollars and twenty-nine cents ($160,478.29.)"

This decision was made on the 19th day of November, 1888, and pursuant to the act above recited was reported to Congress on the first Monday of December then next. On the 3d day of March, 1891, Congress passed an act (26 Statutes at Large, 897,) entitled "An act making appropriations to supply deficiencies in the appropriations for the fiscal year ending June 30th, 1891, and for prior years, and for other purposes," in which, among other things, an appropriation was made to pay the said amount so fixed by the Court of Claims. That sum was received by the claimants in said application. One half of it, less necessary expenses, was paid to and received by said Oliver S. White, and is the sum of which he rendered his account to the court of probate as above stated.

Whether or not that sum should be held to be assets of the estate of William Leffingwell must of course depend upon the intention of Congress as indicated by the act of March 3d, 1891. The claims of citizens of the United States for indemnity on account of the French spoliations

had been repeatedly the subject of inquiry in Congress previous to the action of 1885. Leading lawyers in the Senate and in the House had again and again expressed the view that these claims were property belonging to the estates of those who suffered by those spoliations. Mr. Webster, in a speech made in the Senate in January, 1835, used the following language:—" Before the interference of our government with these claims they constituted just demands against the government of France. They were not vague expectations of possible future indemnity for injuries received, too uncertain to be regarded as valuable or to be esteemed as property. They were just demands, and as such they were property. The courts of law took notice of them as property. They were capable of being devised, of being distributed among heirs and next of kin, and of being transferred and assigned like other legal and just debts. A claim or demand for a ship unjustly seized and confiscated is property as clearly as the ship itself. It may not be so valuable or so certain, but it is as clear a right and has been uniformly so regarded by the courts of law. * * * But France had her subjects of complaint also against the government of the United States, which she pressed with equal earnestness and confidence, and which she would neither postpone nor relinquish, except on the condition that the United States would postpone or relinquish their claims. And, to meet this condition and restore harmony between the two nations, the United States did agree, first to postpone, and afterwards to relinquish, the claims of its own citizens. In other words, the government of the United States bought off the claims of France against itself by discharging claims of our own citizens against France." Webster's Works, Vol. 4, page 159.

In 1850, February 15th, Mr. Truman Smith, then a senator from this state, in a report made by him to the Senate, as chairman of a select committee on the " French spoliation claims," reported in substance the views of Mr. Webster. Since that time there have been no less than nineteen favorable reports made upon these claims in one or the other

branch of Congress, each of them following in general the lines of argument taken by Mr. Webster. The action of Congress in 1891 was in a large degree according to these reports. It may therefore be pretty safely assumed that Congress intended to do that which these reports recommended; that is, to pay debts equitably due to the claimants from the United States.

It is obvious that the Court of Claims regarded the sums awarded by it as assets of the estates of the claimants. That court held, as conclusions of law from its finding of facts, that the seizure and condemnation of the ship Confederacy was illegal; that the owners had a valid claim of indemnity therefor upon the French government; and that such claim was relinquished to France by the United States in part consideration of the relinquishment by France of certain national claims which that government had against the United States; that is to say, that the United States had used a debt due to one of its citizens from the government of France to pay a claim made against itself by that government, thereby creating against itself a clear equitable claim in favor of the citizen which would be assets of the estate of the citizen as distinctly as any other debt due to him.

The Supreme Judicial Court of Massachusetts, in *Balch* v. *Blagge*, not yet reported, passing upon an award of the Court of Claims such as we are now considering, says:— "The Court of Claims dealt with these claims as property after the manner of the Alabama and other claims. *Wilson* v. *Head*, 140 U. S. R., 529. Congress, so far as it made appropriations for the payment of the claims, appears to have so dealt with them except in the case of the bankruptcy of the original sufferers. The proviso concerning the next of kin may perhaps be taken to indicate that Congress did not intend that the awards should be paid to or for the benefit of the creditors of the original sufferers, but still Congress regarded the money to be paid as a part of the estates of the original sufferers. Congress did not concern itself with the bankruptcy of the next of kin or with their creditors. If

Congress had intended that in all cases the awards should be paid to or for the benefit of those next of kin of the original sufferers who were living at the date of the act or at the date of the award, it would have been easy to say so in a few words. In the case of a partnership the money is to be paid to the administrator or executor of the estate of the surviving partner, but it must, we think, be taken to belong to the estate of the several partners according to their proportionate interests."

In the act of 1885 Congress seems to have proceeded on the theory that certain citizens of the United States had sustained losses by reason of the failure of the government to extend to them that protection which is due from government to citizens, and that the United States owed these citizens, or those who stood in their place, some duty in respect to the losses so sustained. The obligation was one not very clearly defined and Congress was careful to declare that nothing in the act should be construed to commit the United States to the payment of the losses. But notwithstanding this declaration further action in recognition of the undefined duty was clearly contemplated and the sufferers from the French spoliations or their legal representatives or assigns were invited to incur expense in reliance upon that contemplated action. The claims to be presented were regarded by the act as choses in action that had passed or would pass to the legal representatives of the original sufferers, and title, either by administration or by assignment, was sufficient, and, except in case of a surviving sufferer, was necessary to give a petitioner standing in the Court of Claims, and must be found by that court as a part of the basis of any congressional action upon the claim.

In passing the act of March 3d, 1891, Congress evidently intended to complete the action contemplated by the act of January, 1885. It had before it the report of the Court of Claims finding that the claimants were entitled to the sum mentioned from the United States. Acting upon that report, and adopting its very language, Congress, by section four of the act of March 3d, 1891, made appropriations "to

pay the findings of the Court of Claims on the following claims for indemnity for spoliations by the French prior to July 31st, 1801, under the act of 1885, namely, among others, to Henry E. Pierrepont, executor of the will of Hezekiah B. Pierrepont, the last surviving partner (deceased) of the firm of Leffingwell & Pierrepont, one hundred and sixty thousand four hundred and seventy-eight dollars and twenty-nine cents."

When Congress appropriated a sum of money to pay a claim established by the Court of Claims to be one which the firm of Leffingwell & Pierrepont was entitled to receive from the United States, it intended something more than a mere gratuity. To pay is to discharge a debt or obligation, not to bestow a gift, and the money was appropriated to be paid not only in discharge of the findings of the Court of Claims, but to Henry E. Pierrepont in his fiduciary character as executor. · All this is as plain as language can make it; and if there was nothing more, it seems beyond question that so much of this fund as came to Oliver S. White is to be regarded as a part of the estate of William Leffingwell and to be distributed accordingly.

The act of March 3d, 1891, had this proviso :—" Provided, that in all cases where the original sufferers were adjudicated bankrupts the award shall be made on behalf of the next of kin, instead of to assignees in bankruptcy, and the awards in the cases of individual claimants shall not be paid until the Court of Claims shall certify to the secretary of the treasury that the personal representatives on whose behalf the award is made represent the next of kin, and the courts which granted the administrations respectively shall have certified that the legal representatives have given adequate security for the legal disbursement of the awards." In respect to this proviso the Supreme Court of Pennsylvania has given in *The Matter of Clement's estate*, Atlantic Reporter, August 10th, 1892, a very clear and cogent argument. We have followed the general outline, and to a considerable extent the language, of that opinion as express-

ing our own views; changing the names in that case to the names in the case before us.

It is contended that the proviso to the appropriation is indicative of an intent to make a direct gift to the next of kin of William Leffingwell, the original claimant. If this be so, either the intent was futile for want of power in Congress to divert the estate of a decedent from the statutory course of administration or the money paid was no part of the estate of William Leffingwell, deceased. If the latter proposition can be sustained, and it necessarily results from regarding the fund as a direct gift to the living next of kin, and not as accruing from the payment of a debt due to their ancestor, then Oliver S. White received it as trustee for the persons described as next of kin of William Leffingwell, and not in virtue of his office as administrator, and the probate court had no jurisdiction to distribute the gifts. But the proviso is as clearly evincive of an intent that the money appropriated to pay this claim should be paid to Mr. White in his capacity of administrator as in the language of the appropriation itself. While the clause—"the award in case of individual claimants shall not be paid until the Court of Claims shall certify to the secretary of the treasury that the personal representatives on whose behalf the award is made represent the next of kin," standing alone would indicate that the money was intended to be a gift to the persons described, and that by "personal representatives" was not meant representatives of the decedent, but the representatives of the donees of Congress, the succeeding member of the sentence leaves no doubt that legal representatives of decedents—executors and administrators —were intended to be the recipients, and upon the trusts declared and appointed by the law of their testator's or intestate's domicile. They were to be persons to whom administration had been granted and by whom security had been given. The courts in Connecticut, within the meaning of the proviso, which grant administration, are the courts of probate in the respective districts. They have power to take security for the administration of decedents' estates

according to the laws of Connecticut, and not otherwise, and have not power to take security for the execution of trusts over which the court of probate has no jurisdiction. The power and jurisdiction of these courts may be presumed to have been known to Congress, and therefore, when it required the secretary of the treasury to be certified by them " that the legal representatives have given adequate security for the legal disbursement of the awards," it must be presumed to have intended such security as they could take and certify. Requiring then, as a condition precedent to the payment of the award, that the administrator should have given security as such, according to the laws of Connecticut, for the legal disbursement of the same, it must have intended that the disbursement should be in accordance with the conditions of that security, namely, to the persons who were entitled to participate in the distribution of the estate upon which the administrator was acting. These are the persons who are described in the act as next of kin.

In the fourth appeal a further question is made which can be disposed of briefly. We think that by the will of William Leffingwell one trust only was created for the benefit of Edward H. Leffingwell; that the property devised to the trustees by the residuary clause of the will they took upon the same trust upon which they took the property devised to them in the earlier part of the will. Of that trust Mr. Beckley is now the trustee. As we hold that the fund in the hands of Mr. White, the administrator, is assets of the estate of William Leffingwell, to be distributed according to the provisions of his will, we think the order of distribution of the one fifth was properly made to Mr. Beckley, the trustee.

The Superior Court is advised to affirm the decree of the court of probate.

In this opinion CARPENTER, TORRANCE and FENN, Js., concurred. SEYMOUR, J., concurred in the result, but died before the opinion was written.